Argued March 1; affirmed June 20; rehearing denied July 25, 1944

# STATE *v.* FOLKES
(150 P. (2d) 17)

Before BAILEY, Chief Justice, and BELT, ROSSMAN, KELLY, LUSK, BRAND and HAY, Associate Justices.

*Leroy L. Lomax,* of Portland, for appellant.

*Harlow L. Weinrick,* of Albany, District Attorney, for respondent.

BRAND, J.

Ensign Richard Floyd James received travel orders requiring him to go from Seattle, Washington, to Los Angeles, California. His wife, Martha Virginia James, was a passenger occupying lower berth 13, car D, train 15. She was unable to secure accommodations on the troop train which carried her husband, but they were informed that from Portland, Oregon, south, his car and hers would be in the same train. Train 15 was delayed en route with the result that her husband was not, as anticipated, a passenger on the train which carried Mrs. James from Portland toward Los Angeles.

On January 23, 1943, and near 4:30 A. M., someone entered Mrs. James' berth and cut her throat, severing a vein and an artery. Her screams aroused passengers in the car, three of whom saw the murderer, dressed in a long dark overcoat, rushing to the rear of the car. Two of the three actually saw him backing out of lower 13. Mrs. James had struggled into the aisle where she died a few moments later. The three witnesses, Wilson,

Conner and Norton, were the only persons who saw the murderer at that time. They were unable to identify the defendant as the man seen departing from lower 13.

In fleeing from car D, the murderer went toward the dining car which was immediately to the rear of car D. The defendant, Robert E. Lee Folkes, was second cook on that dining car.

Shortly before 4:25 A. M. the defendant, Folkes, was in the smoking room of car D where he talked with Hughes, the porter. He was then dressed in a white coat. Marjorie Wasserman, an occupant of car D, saw a colored man dressed in a white uniform enter that car before the train left Portland and talk with Mrs. James. She made no positive identification of the defendant, but testified, "he looks like the one." Witness Wilson, a United States Marine, testified that after the murder he searched all cars to the rear of car D and that in the process of the search, he entered the kitchen where he found the defendant. The defendant told him that he had been there for about twenty minutes. Wilson testified that "beads of perspiration were forming on his [defendant's] forehead and starting to run down his face." Wilson described the kitchen as cool, but other witnesses testified that the fires were burning.

The evidence discloses that it was the defendant's duty to arise at 4:30 A. M. on January 23 and prepare the kitchen for the day's work. Witness Kelso, the occupant of upper berth 11 of car D, testified that on January 23 he rose between four and five in the morning and descended to the aisle with the intention of going into the men's room to shave, but headed in the wrong direction. While in the aisle, he encountered a colored man who directed him to the men's room.

He could not identify the defendant as the man. Witness Clarence W. Champlin testified that when the train reached Klamath Falls, the defendant and witness Kelso were brought together and the defendant admitted that he was the person who had shown Kelso the way to the men's room in car D.

The importance of the foregoing evidence to which reference will later be made lies in the fact that it corroborates various portions of the admissions and confessions of the defendant. The remaining testimony relates largely to the alleged admissions and confessions of the defendant and to the circumstances under which they were made.

The defendant presents three assignments of error and no more. By the first assignment, it is asserted that the court erred in permitting the state to introduce into evidence exhibits K and L which were transcribed stenographic notes of conversations with the defendant wherein the defendant confessed his guilt in great detail.

The second assignment is that the court erred in receiving in evidence oral admissions of the defendant for the reason that the purported oral admissions were not spontaneous and were involuntarily given.

The third and last assignment is that the court erred in refusing to give defendant's requested instruction to the effect that the oral admissions of a party should be viewed with caution.

We will now consider the first assignment of error. In the course of the State's case, the prosecution announced its intention to offer in evidence "admissions or confessions of the defendant." After prolonged examination of witnesses in the absence of the jury,

the court held that the statements were voluntary and they were received in evidence.

Witness Nancy Lyman, secretary of the Homicide Bureau in Los Angeles, testified that she was present at the city hall in Los Angeles at about 10:00 A. M., January 27, 1943, when the defendant made a statement. She testified without impeachment or contradiction that there was conversation between the defendant and Lieutenant Tetrick and Captain Rasmussen, both officers of the Los Angeles police force. She testified that she accurately took down, in shorthand, the conversation which she heard and accurately transcribed her notes and that exhibit K was the transcription of them. She also testified, "I can't remember verbatim what I heard." The defense objected to the receipt of exhibit K specifying, among others, the following grounds: that the statement was not signed; and "* * * that the only manner in which that statement could possibly be used in a trial of a cause before this court is to refresh the witness' memory as a memoranda to refresh her memory. The defendant has no manner at all of cross-examining that statement." The objections were overruled.

It is important to note that the statement was taken on the morning of January 27. The record discloses that on the evening of January 26, defendant had made a full verbal confession to officers Tetrick and Rasmussen. Exhibit K contains not only a confession, but a ratification of the one which was made the preceding evening. The statement commences with questions by Lieutenant Tetrick, as follows:

"Q. Bob, do you want to tell the same story you told last night about the killing?

"A. Yes.

"Q. You want to tell anything?

"A. I made my statement last night. That is okay, it stands like it is."

The State contends that exhibit K is a confession of the defendant and not a mere memorandum of the witness and that, being a written confession, it was admissible in evidence if voluntarily made, although unsigned by him. The State relies in part upon Wharton's Criminal Evidence, Vol. 2, 11th ed., § 582, wherein the author says: "Nor is it necessary that it [the confession] should be signed by the accused."

■ We do not hold that a confession to be admissible must always be signed by the defendant, but we do hold that before an instrument can be deemed admissible as the written confession of the defendant, he must in some manner have acquiesced in the correctness of the writing itself. A writing not signed, or not thus approved by the defendant, is not *per se* his confession. 22 C. J. S. § 833, 1455; *Mason, Ehrman and Company v. Estate of Ben P. Lewis,* 131 Or. 242, 276 P. 281, 281 P. 123, 282 P. 772; *State v. Edmunson,* 120 Or. 297, 249 P. 1098, 251 P. 763, 252 P. 84; *Hall v. Brown,* 102 Or. 389, 202 P. 719; *Susewind v. Lever,* 37 Or. 365, 61 P. 644; *Friendly v. Lee,* 20 Or. 202, 25 P. 396; 125 A. L. R. 65 (note).

Although a broader rule is suggested in *Prather v. State,* Oklahoma, 137 P. (2d) 249; *Bosko v. People,* 68 Colo. 256, 188 P. 743; and *People v. Reed,* 333 Ill. 397, 164 N. E. 847, we are not disposed to extend the rule beyond the boundaries indicated by our earlier decisions.

■ Upon its face, exhibit K indicates that the defendant made a consistent, convincing and voluntary verbal confession of guilt, but that is not to say that the instru-

ment itself is a confession. If it were written by him or bore his signature, upon preliminary proof of its voluntary character, the instrument would have been admissible as a written confession, or if it had been shown to or read by him and had been acquiesced in by him as correct, the same result would follow. But the defendant never saw, heard, wrote or signed the instrument. It was error for the court to receive it in evidence as such and to send it to the jury room with the other exhibits.

It will be recalled that the witness Lyman testified that she wrote down what she heard, but said, "I can't remember verbatim what I heard." This presented a typical case of a memorandum which, upon proper foundation laid, could have been used to refresh the recollection of the witness. O. C. L. A. § 4-707.

It was highly desirable that the jury should know not only the substance of the defendant's statements, but his exact words. The witness testified that she could not remember them and even if she had not so testified, it is almost inconceivable that any stenographer could have reproduced the statement from memory. At this point, counsel should have followed the usual routine and asked the witness if by examining the transcribed notes her recollection would be refreshed. If she had answered in the affirmative, she would have been permitted to use the notes and from them to testify as to the exact questions asked and answers given. If, on the other hand, her answer had been that she retained no recollection of the particular facts, she would, under our statute, have been permitted to read her notes to the jury. *Mount v. Welsh,* 118 Or. 568 at p. 590, 247 P. 815; and see *State v. Bartmess,* 33 Or. 110, 54 P. 167.

■ We can find no tenable objection to the substance of exhibit K. Every part of it was proper for the consideration of the jury. The technical error relates solely to the manner in which it was brought to their attention. It was received in evidence as an exhibit. It was, in fact, a memorandum. As an exhibit, the jury saw it and heard it read by the district attorney. As a memorandum the jury would not have seen it, but would have heard it read. The reading would have been by the witness on the stand instead of by the district attorney. The identical confession would have been before the jury with this difference: it would have been proven as an oral confession by the refreshed recollection of the stenographer who took it down or as a memorial of lost recollection, instead of being proven as a written confession in and of itself.

Assuming that the admission of exhibit K in evidence constituted error, the following cases, though not exactly in point, do indicate that the error was not prejudicial: *State v. Foulds,* 127 N. J. Law 336, 23 A. (2d) 895 (where the New Jersey court goes beyond the position we have taken); *State v. Lustberg,* 11 N. J. Misc. 51, 164 A. 703; and *State v. Donato,* 106 N. J. Law 397, 148 A. 776.

If the exhibit had been properly used to refresh the recollection of the witness and the jury had demanded the right to inspect it, we have the authority of Professor Wigmore that they would have been entitled to see as well as hear it. This is a matter of significance when we are considering whether the receipt in evidence was prejudicial. Speaking of memoranda used to refresh recollection, the learned author says:

"That the *offering party* has not the right to treat it as evidence, by reading it or showing it or

handing it to the jury, is well established. That the *opponent* may do this, or that the jury may of its own motion demand it, is equally conceded." 3 Wigmore, Evidence, 3d ed. § 763, p. 112.

■ The most that we can say is that Exhibit K approaches the very verge of admissibility as a written confession. By the last sentence of the exhibit, it appears that defendant said, "as long as she has it down and I read thoroughly and understand, I will be willing to take the medicine which the killer should take." This was not the adoption of the instrument as his written confession, for it had not yet been written, but it was a manifestation that he would adopt it if it was properly taken down and if he should read and understand it.

Again, Captain Rasmussen testified:

"After the confession was written up, he offered to sign it and we told him we didn't want him to sign it at that time, and we would wait until the officer from Oregon came down, and he could sign it in his presence and obviate the necessity of us coming up here to testify."

We are not sure whether the captain meant that the offer to sign was made after the transcript was written up, or merely meant that defendant offered to sign it when at a later time it should be written up. Which meaning was intended is of no importance for, in fact, the defendant did not see or sign, but the undisputed testimony of the captain is relevant to show that the confession was voluntarily made and that defendant, at a time when the memory of his conversation was fresh, was willing to sign it and thereby adopt it as his own. Although the distinction may be a narrow one, we think that technical error was committed. We shall postpone the statement of our conclusion as to whether

the error warrants a reversal of the judgment until we have reviewed other portions of the evidence.

■ The defendant was returned to Albany, Oregon, and on January 31 another statement was taken before Kathleen K. Miller, court reporter. This statement was also taken in the form of questions and answers in the presence of Dr. Joseph Beeman, Lieutenant Ray C. Howard of the Oregon State Police, District Attorney Weinrick and Mrs. Miller. The court again heard prolonged testimony in the absence of the jury concerning the voluntary character of defendant's statements and held them to be voluntary. The accuracy of the court reporter's shorthand notes and of her transcription thereof was proven and is unquestioned. The transcript containing questions and answers was, as in the case of exhibit K, unread and unsigned by the defendant. It was also received in evidence as exhibit L and went to the jury. Exhibit L contained forty-seven pages and it is obvious that no reporter could have recollected the exact statements of the defendant without consulting the transcript for the purpose of refreshing memory. Here again, however, the prosecution omitted the usual questions which would have permitted the exhibit to be employed either to refresh memory, or as a record of lost memory. Our comments upon exhibit K are also applicable to exhibit L and its receipt in evidence also constituted technical error. Like exhibit K, exhibit L contains the direct, detailed confession by the defendant that he murdered Mrs. James.

The second assignment of error is based upon the defendant's claim that the purported confessions were not spontaneous and were involuntarily given. This assignment rests upon four contentions which are urged by the defendant: first, that the statement was

rendered involuntary by reason of long hours of questioning; second, by reason of the failure to take the defendant before a magistrate in violation of his alleged constitutional rights; third, failure to give him the benefit of counsel; and fourth, because whiskey had been purchased for the defendant by the California police officers. Before considering these specific contentions, it is well to bear in mind the tests which have been applied by this court and which are firmly established in our law for the determination of the voluntary character of a confession.

■ A confession, even though made to police officers and while in custody, is admissible if not induced by fear, violence, threats, or promises of reward or immunity, and this is true although the accused may not have been cautioned that his statement might be used against him or advised as to his legal rights. *State v. Moore,* 124 Or. 61, 262 P. 859; *State v. Butchek,* 121 Or. 141, 253 P. 367, 254 P. 805; *State v. Stevenson,* 98 Or. 285, 193 P. 1030; *State v. Wilder,* 98 Or. 130, 193 P. 444. The character of inducement which will render a confession involuntary is well stated in the case of *State v. Green,* 128 Or. 49, 273 P. 381. In that case, the court, speaking of a confession, said:

> "* * * The only fair test, if such it may be called, which can be applied is this: Was the inducement held out to the accused such as that there is any fair risk of a false confession, for the object of the rule is not to exclude a confession of the truth but to avoid the possibility of a confession of guilt from one who is in fact innocent: * * *."

Applying the tests as this court has always interpreted and applied them, we hold that the evidence discloses that the statements of the defendant were not

induced by threats, fear, violence, promises of immunity or hope of reward, and were therefore voluntary. The testimony to this effect is repeated, unimpeached, uncontradicted and is supported not only by the testimony of the two reporters who took exhibits K and L, but by that of the officers who questioned the defendant and it is confirmed by testimony concerning the admissions of the defendant himself. For example, Officer Kirk of Oregon testified:

"A. * * * I asked Mr. Folkes how the police department treated him down there, and he told me alright.

"Q. Did he make any complaint to you of any nature about the treatment that he had received in Los Angeles?

"A. He did not."

The fact that the defendant confessed is established not only by exhibits K and L and by the testimony of the officers, but also by that of Jessie Wilson, the defendant's so-called common law wife.

We turn to the contentions of the defendant by which he claims that the defendant's statements which were voluntary in fact and under our decisions should now be held to be involuntary in law. First, we consider the objection that the defendant was subjected to long hours of questioning. The testimony of Lieutenant Tetrick and Captain Rasmussen concerning the questioning at Los Angeles is in substantial harmony upon the matter of time. It discloses that the defendant arrived at the Union depot, Los Angeles, at 8:30 A. M. on January 25. He was taken to the city hall and questioned, but not continuously, until 11:00 A. M. He was again questioned between 2:00 P. M. and 4:00 P. M., but not continuously. During this period Jessie

Wilson visited him at the city hall for twenty or thirty minutes. There was no further questioning that day. On January 26 he was questioned between the hours of 10:00 A. M. and 2:30 P. M., but by no means continuously, for within that period he was again permitted to visit with Jessie Wilson alone for about an hour and a half. He was again questioned between 4:00 P. M. and 7:00 P. M. During a part of this time, Jean Bechtel, a stenographer, was present and took the conversation in shorthand. Her notes, to which reference will later be made, were transcribed and were offered in evidence at the trial as defendant's exhibit 2. The questioning between 4:00 P. M. and 7:00 P. M. was not continuous.

The next occasion on which the defendant was questioned was at Jessie Wilson's house. In the early evening the defendant had asked to talk to Captain Rasmussen alone. The request was granted and defendant and Rasmussen conversed alone for about fifteen minutes during which time defendant repeated his earlier request that he be taken to Jessie Wilson's home. Captain Rasmussen, Lieutenant Tetrick, and the defendant arrived at the home of Jessie Wilson at about 7:15 P. M. There were several people present. Jessie Wilson was in bed. The two officers and the defendant entered her bedroom where the defendant talked with her. The defendant asked to be permitted to stay with her an hour, to which the captain agreed. During this period, the undisputed evidence discloses that the defendant made his first voluntary oral confession in the presence of the officers after which he took a drink of whiskey, had a meal of pork chops, greens, bread "and some other stuff." After waiting about an hour, his mother arrived to see him. The

officers then drove his mother to her home and returned the defendant to the city hall where he was met by Dr. DeRiver who examined him for fifteen or twenty minutes. They arrived at the city hall at 9:45 in the evening.

The next questioning took place on Wednesday, January 27, "about nine or ten o'clock in the morning." He was first taken to the office of Captain Rasmussen where he remained for five or ten minutes. He was then brought to room 42. Nancy Lyman, the stenographer, took the conversation in shorthand. The notes were transcribed and are in evidence as exhibit K. The questioning on this occasion occupied about an hour or an hour and a half. After the written statement was completed, the stenographer left the room and Finneran and Tetrick were alone with the defendant. The defendant was asked:

"Bob, why did you kill that girl; why did you get in the berth with her?"

and he said,

"Why, I saw her standing there and she looked like my type of woman and I just couldn't get her off my mind."

Thereafter, Dr. DeRiver gave the defendant a physical and mental examination in the presence of Finneran and Tetrick. The exact hour when the examination ended is not disclosed, but after the doctor had completed it, the defendant was taken to the Southern Pacific commissary so that he could get his wages and was then taken to the Southern Pacific yards where he cashed his check and was then taken out to lunch at about 1:30 or 2:00 P. M.

The next questioning took place on Thursday morning, January 28, at about ten o'clock on which occasion

they showed him some knives which he examined and said, "It was none of them."

On January 29 he was taken to the hall of justice in connection with his extradition to Oregon. At that time the defendant stated that he had an attorney by the name of Gleason who had advised him to sign no extradition papers unless the attorney was present. Tetrick then searched for and found Gleason who advised the defendant, and the defendant then signed the waiver. The above constitutes a statement of the entire period within which questionings occurred so far as the record discloses.

We turn now to the examination of the defendant by the Oregon officers after he reached Albany. On February 2, at the Linn County jail, Dr. Lew Hurd gave the defendant a physical examination. It does not appear that any questions were asked him by the doctor. He was found to be in sound physical condition.

■ On January 31 the defendant was questioned intermittently between 3:20 P. M. and 10:15 P. M. During a portion of this time, Kathleen Miller, the court reporter at Albany, Oregon, was present and took the conversation in shorthand which was later transcribed and offered in evidence as exhibit L. Lieutenant Howard advised the defendant that any statement he made would be used against him in criminal proceedings. The uncontradicted testimony shows that the statements made to officers Howard and Beeman and District Attorney Weinrick were voluntary. There was evidence in the preliminary hearing before the judge in chambers that the defendant was fed between 2:00 P. M. and 3:00 P. M. The examination during the period mentioned was not continuous. We

hold that none of the confessions of the defendant were rendered involuntary or inadmissible by reason of the length of the periods of questioning or the manner in which it was done.

We have given careful consideration to the recent decision of the United States Supreme Court in the case of *Ashcraft v. State of Tennessee,* 322 U. S. 143, 64 S. Ct. 921, 88 L. Ed. 1192, decided May 1, 1944. That case was brought to the attention of this court by a petition for rehearing in *State v. Layton,* 174 Or. 148 P. (2d) 522, decided April 25, 1944. In the Layton case, the questioning of the defendant covered a much longer continuous period than in the case at bar. We considered *Ashcraft v. Tennessee* inapplicable and the petition for rehearing was denied.

Ashcraft had been convicted in the Tennessee court for the murder of his wife. The conviction was based upon evidence of a confession made after he had been questioned continuously for thirty-six hours during which time he was confined in a room under high-powered lights without rest or sleep and during which time he was given but "a single five-minute respite" from "one continuous stream of questions." In the Ashcraft case, though the trial court heard evidence in the absence of the jury it did not determine from the evidence that the confession was voluntary, but only held that reasonable minds might differ on that issue and so received the confession in evidence. While in reaching its conclusion the Supreme Court did "not resolve any of the disputed questions of fact" as to what transpired during the thirty-six hours, or as to whether Ashcraft ever did confess, it was obviously influenced by the fact that there was conflicting evidence. There was testimony that the defendant was

threatened and abused; that he became blinded by the light, his body weary and the strain on his nerves unbearable. The evidence was also conflicting as to whether defendant ever made a confession. The court held that the situation was "inherently coercive" and that the receipt in evidence of the confession was a violation of the due process clause of the United States Constitution. The court repeatedly referred to the "excellent reputation" of the defendant and his happy and successful home life, though what those factors may have to do with the question of procedural due process of law in obtaining a confession, we do not know. We had supposed the constitutional guarantees of fair trial applied to high and low without distinction.

The differences in degree and kind between the Ashcraft case and the one at bar are clear. Here there was no unduly prolonged period of questioning, no bright lights, no late night sessions, no conflict of testimony as to the making of confessions, no conflict as to their having been voluntarily made, no evidence of threats or abuse. Here, also, under our state procedure which was followed by the trial judge, the voluntary character of the confession was inquired into by the court in the absence of the jury. All evidence offered by either party was considered and the court held the confessions were voluntary. The same issue was again fairly submitted to the jury and it is clear from their verdict that they must have found that defendant had voluntarily confessed the crime. The startling aspect of the Ashcraft case is not to be found in its disapproval of the methods employed in securing a confession, but inheres rather in the fact that the decision is placed upon constitutional grounds which

further restrict the exercise of independent judgment by the courts of the various states. We do not condone such conduct as that reported in the Ashcraft case. Irrespective of constitutional limitations and upon the principles of the common law, the conduct of the officers in the Ashcraft case constituted potent evidence of duress which required serious consideration by both the trial judge and the jury, along with the other evidence, in passing upon the voluntary character of the confession. Such misconduct could have warranted the trial judge in finding that a confession so obtained was, in fact, involuntary and inadmissible without reliance upon any rule of law that the confession was inherently coercive or in violation of a constitutional mandate. The Ashcraft case, being upon constitutional grounds, would bind this court if in point, notwithstanding the vigorous and highly persuasive dissent of Justices Jackson, Roberts and Frankfurter. But it is clearly distinguishable.

■ Defendant contends that his confessions were obtained in violation of constitutional right by reason of the fact that he was subjected to "questioning by numerous police officers" without being first taken before a magistrate. In support of this contention, he cites only *McNabb v. United States,* 318 U. S. 332, 87 L. Ed. 819, 63 S. Ct. 608. That case holds inadmissible a confession obtained by a peace officer who failed to take the arrested person before a committing magistrate within the time required by the federal statute. That case together with *Anderson v. United States,* 318 U. S. 350, 63 S. Ct. 599, 87 L. Ed. 829, expanded the common law exclusionary rules as far as federal practice is concerned, but the Supreme Court expressly renounced

the idea that the decision was based upon constitutional grounds. The court said:

"In holding that the petitioners' admissions were improperly received in evidence against them, and that having been based on this evidence their convictions cannot stand, we confine ourselves to our limited function as the court of ultimate review of the standards formulated and applied by Federal courts in the trial of criminal cases * * *."

The decisions were based on the supervisory authority of the Supreme Court over the administration of criminal justice in the federal courts. The decision was not intended as a constitutional limitation upon the powers of the courts of the several states. The court said:

"* * * Moreover, review by this Court of state action expressing its notion of what will best further its own security in the administration of criminal justice demands appropriate respect for the deliberative judgment of a state in so basic an exercise of its jurisdiction * * *."

To that case we have given respectful consideration as a precedent, though not a binding one. We find it distinguishable from the case at bar and out of harmony with the law of this jurisdiction. See 42 Mich. L. Rev. No. 4, p. 679, Feb. 1944 and *United States v. Mitchell,* 322 U. S. 65, 64 S. Ct. 896, 88 L. Ed. 1140; *Fry v. State,* (Okla.) 147 P. (2d) 803; *State v. Browning,* (Ark.) 178 S. W. (2d) 77; 3 Wigmore, Evidence, (3d ed.) § 851 at p. 319.

Notwithstanding the recent extension of the boundaries of procedural due process by the United States Supreme Court as at present constituted, we cannot believe that it will go to the extreme length of holding that one is deprived of due process of law whenever

illegally obtained evidence is received against a defendant in a criminal trial. To do so would be to overrule upon constitutional grounds hundreds of decisions by many state courts of last resort which have adhered to the "orthodox rule." 8 Wigmore on Evidence, §§ 2183 and 2184. Even if the Supreme Court should venture to that unprecedented extent, it would not follow that any constitutional right would be invaded by the reception in evidence of a confession if the sole objection to it was that the confession was obtained before the defendant was taken before a magistrate. When evidence is seized by an illegal search, the illegality is the immediate and proximate cause which produces the evidence, but when the illegality, if any, consists merely in questioning the defendant, having failed first to take him before a magistrate, the confession, if voluntarily made, is only remotely, if at all, connected with the fact that the officer disobeyed the statute. It must be remembered that at least one of the purposes of a criminal trial is to bring murderers to justice. We have examined all of the decisions cited in the McNabb case and find none of them controlling here. There is no support in the record for the contention that the defendant was threatened with mob violence or was influenced by any fear of it.

■ It is contended that defendant was not given the benefit of counsel. The evidence discloses that the defendant employed counsel and had the benefit of legal advice while in Los Angeles. It does not appear when he first consulted counsel. There is no evidence that he was ever refused the right to legal advice and on at least one occasion the officers dili-

gently sought for and produced his attorney that he might have further advice.

■ Lastly, it is contended that the confession was involuntary because whiskey was purchased for the defendant by the California officers and because he was intoxicated at the time of his confession. The facts are as follows: On January 25, in Los Angeles, the defendant said to officer Tetrick, "Will you take me out to my house and let me talk to my wife, get me a drink of whiskey and let me have something to eat and I will tell you more about this case." At that time the officer refused. Again, on January 26, he made the same request, on this occasion to Captain Rasmussen. It was finally agreed that he should be taken to the home of Jessie Wilson. On the way, the defendant said, "Are you going to get me a drink?" The defendant gave Tetrick a dollar and Tetrick, at his request, purchased some whiskey for ninety-nine cents. Captain Rasmussen took possession of the bottle. The testimony of the two officers is as follows:

Upon the arrival at the home of Jessie Wilson, she was found in bed. They entered her room and defendant asked if he would be permitted to stay an hour, to have a drink of whiskey and something to eat. The answer was in the affirmative. Defendant then said, "Now you want me to tell you about the killing?" He then proceeded to make a full and complete confession to the two officers, no stenographer being present. The officers testified that the whiskey bottle was not opened until after the foregoing confession had been made, the bottle having remained unopened in the possession of Captain Rasmussen until that time. After the confession, defendant asked for a drink and the captain took the bottle out of his pocket and handed

it to him. Defendant and Jessie Wilson both took a drink. Defendant said, "Go ahead and have a drink; this is maybe the last one you will have with me, Baby, I am a killer and I am going to take my medicine."

After the confession and after the defendant had taken two drinks, the defendant's mother called him on the telephone. The officers testified that the defendant said to her, on the phone, "What you read in the papers is true, and I am the murderer." His mother indicated a desire to see him and the officers agreed to wait until his mother arrived.

We come now to the only testimony which to any extent contradicts the evidence of the officers concerning the substance and circumstances of the confession at the home of Jessie Wilson. Jessie Wilson testified concerning the same occasion, as follows:

"Q. Will you tell the jury the condition the defendant was in at the time you saw him?
"A. Well, he was very intoxicated and looked very bad and looked as though he was beaten and his face was swollen.
"Q. Did you see him have any intoxicating liquor in your presence.
"A. Yes, sir.
"Q. Tell the jury just what occurred when they brought the defendant out there.
"A. Well they just came in so he could say he came out to see me. He took a drink and he asked them if they was ready to take it down, and they took it down on paper.
"Q. Keep your voice up.
"A. He asked them if they were ready to take down the confession, and they said they were, and he drank the liquor, and they took down the confession.
* * *

"Q. Were any demonstrations conducted there? I refer to any demonstration upon your body in any manner whatsoever.

"A. No."

Witness Jessie Wilson identified a picture of her apartment and that was substantially all of her testimony. It will be observed that at no time did she state when he took the first drink, or whether he appeared intoxicated at any time until after the confession and that she herself verifies the testimony to the effect that a confession was made. It is true that she said "he drank the liquor and they took down the confession." The statement is literally true, but it is not the equivalent of saying that they took down the confession after he had drunk the liquor. The matter was not clarified either in direct or cross-examination.

Defendant's mother testified that the defendant was intoxicated when she reached the house. The undisputed evidence is to the effect that she did not arrive until after the confession and until after the defendant had taken several drinks of whiskey and had eaten a meal. Her testimony contains, and could contain, no contradiction of the essential portion of the account given by the officers, but Mrs. Folkes did testify that the defendant did not at any time *tell her that he had killed or murdered anybody.*

Upon the return of the defendant to the jail he was examined by Dr. DeRiver who said it was apparent that he had had a drink, but was not intoxicated. Under these circumstances, we think that the confession voluntarily given to the officers and verified by them and by Jessie Wilson was admissible in evidence. This was not a case of plying the defendant with liquor,

the whiskey being bought at defendant's request with defendant's money and delivered to him only after the confession had been made. There was nothing in the conduct of the officers which would have a tendency to induce the defendant to make a false statement. There is no evidence that the defendant was permitted to have any liquor at any other time after his arrival in Los Angeles.

■ We are of the opinion that the verbal testimony as to what the defendant said in Albany so far as it pertained to Mrs. James' death was admissible and that the second assignment of error lacks merit. The evidence that defendant's confessions were, in fact, voluntarily made is so clear, conclusive and uncontradicted that we will not encumber the record by quoting the testimony. Under these circumstances, the confessions constitute the highest sort of evidence.

The defendant never took the witness stand at the trial. He had a right to refrain from testifying and, under a harsh rule of our law, the prosecution was prohibited from commenting to the jury on the significant fact that the defendant, who knew the truth, had failed to testify. We venture no inference that the defendant's failure to testify indicated his guilt, but the fact remains that by reason of his failure to testify or to produce any other evidence in contradiction of the confession, the testimony of the witnesses for the State is in every substantial particular unimpeached and uncontradicted, except as stated. (The exception refers to the testimony of Jessie Wilson and defendant's mother, supra.) Concerning the undue limitations imposed by the law upon the admissibility of confessions, Professor Wigmore writes as follows:

"* * * The spirit that thus tended to prevail in the law has been properly described 'as a weak

sentimentalism towards criminals', and it assuredly had unfortunate results. * * *'' 3 Wigmore, Evidence, 3d ed. § 865, p. 352.

Many authorities characterize confessions as the highest evidence known to the law; some hold them to be of little weight. 22 C. J. S., § 843, p. 1479. Wigmore has stated the principle which harmonizes the apparently conflicting decisions, as follows:

> "This seems to be the simple explanation of the apparently contradictory views; if we distinguish the confession as evidence from the evidence of the confession, we find that few have ever really doubted that the first is in itself of the highest value, while the second is always to be suspected." 3 Wigmore, Evidence, 3d ed. § 866, p. 358.

Again, he says:

> "Now, assuming the making of a confession to be a completely proved fact—its authenticity beyond question and conceded,—then it is certainly true that we have before us the highest sort of evidence. The confession of a crime is usually as much against a man's permanent interests as anything well can be; and, in Mr. Starkie's phrase, no innocent man can be supposed ordinarily to be willing to risk life, liberty, or property by a false confession. Assuming the confession as an undoubted fact, it carries a persuasion which nothing else does, because a fundamental instinct of human nature teaches each one of us its significance." 3 Wigmore, Evidence, 3d ed. § 866, p. 357.

In the case at bar, the making and the authenticity of the confessions is established beyond any reasonable doubt. But for one statement by defendant's mother who denied that he confessed *to her,* the testimony is wholly uncontradicted. Counsel for the defendant has not had the temerity to suggest that the defendant is

innocent. He stands upon the unsubstantial ground of technical error. In a case where the issue related to the penalty to be imposed on a plea of guilty, it was said:

"It is not urged that the defendants are not guilty or that their voluntary written confessions —the highest order of proof known to the law— are not true in every particular. These confessions alone were amply sufficient to sustain the death penalty." *People v. Popescue,* 345 Ill. 142, 177 N. E. 739, 77 A. L. R. 1199 at p. 1210.

■ The third and last assignment of error is that the court erred in refusing to give defendant's requested instruction to the effect that oral admissions of a party should be viewed with caution. We think that the requested instruction should have been given, but this court has held that the matter of giving the cautionary instruction relative to oral admissions of the party rests within the sound discretion of the trial court. *Fitze v. American-Hawaiian Steamship Co.,* 167 Or. 439, 117 P. (2d) 825; *Arthur v. Parish,* 150 Or. 582 at p. 591, 47 P. (2d) 682.

The circumstances in the case at bar must have strongly appealed to the trial court in the exercise of its discretionary power. When the cautionary instruction is given by the trial courts, it is the practice to explain to the jury the reason for the caution, namely that there is a risk or at least a possibility that witnesses testifying to the verbal admissions of a party may not have accurately remembered and exactly reported the admissions. This element of uncertainty was removed when expert stenographers took down in shorthand a verbatim report of questions and answers in the case at bar. *Prather v. State,* supra.

The accuracy of their work is in no way challenged. Their credibility is in no way impeached. When we add the further fact that numerous witnesses testified to the substance of exhibits K and L and that their testimony is undenied, we find persuasive ground for holding that the failure to give the cautionary instruction was not prejudicial error. Furthermore, while the defendant made some isolated statements which amounted to admissions against interest, but did not rise to the dignity of a confession, the truth is that substantially all of the damaging statements made by the defendant, and which were admissions against interest, also constituted parts of a connected story repeatedly told by the defendant and which were, in the eyes of the law, confessions of guilt. While the trial court did not expressly mention admissions as distinguished from confessions, it ably instructed the jury as to their duties, advised them of their right "to scrutinize the manner in which a witness testifies, the facts which may influence in one way or another, the interest which the witness manifests in the outcome of the case," and gave full and fair instructions, placing the burden of proof upon the State, stating that "all of the presumptions of the law, independent of the evidence, are in favor of the defendant." Furthermore, the court, without referring specifically to either admissions or confessions, carefully instructed the jury with reference to evidence of "statements claimed to have been made by the defendant and which statements, in part, are relied upon to establish defendant's guilt." The jury were fully instructed that before such "statements" could be considered in evidence, it must appear that they were voluntary and not procured or induced by promises, directly or indirectly made, or as the

result of force, fear, oppression or coercion. Under these circumstances, the third assignment presents no ground for reversal of the judgment.

It is argued that there are discrepancies between the statements of the defendant as reported by the officers and as they appear in exhibits K and L. The inference is drawn that these discrepancies are the result of faulty testimony by the witnesses. The defendant himself admitted making inconsistent statements and contended that in some particulars his memory was not clear. It seems to us improper to assume that minor discrepancies are those of the officers who reported his statements rather than of the defendant who made them. While minor discrepancies do exist, there is no substantial inconsistency in any of the statements of the defendant as repeated by the witnesses or as incorporated in the exhibits. The chief difference between the verbal testimony and exhibits lies in the fact that some statements were contained in the exhibits which do not appear in the verbal testimony of the officers and that there are some statements in the verbal testimony of the officers which do not appear in the exhibits. This was of necessity true. The memory of the officers could not be as detailed as the verbatim report of the stenographers and the officers testified to numerous statements made by the defendant when no stenographer was present. Witness Howard testified at considerable length concerning what he characterized as discrepancies in the various statements of the defendant, none of which, however, were inconsistent with the full and detailed confessions of guilt.

It is urged upon us that the evidence, especially exhibit L, tends to show other misconduct of the de-

fendant not relevant to the issue before the jury. We first observe that there is no assignment of error which raises that question. The bill of exceptions contains no reference thereto and there is not a word in appellant's brief which raises that issue. Rule 2 of this court provides in part:

"No alleged error of the circuit court will be considered by this court unless regularly presented in the assignments of error contained in the appellant's opening brief, except that this court reserves the right to take notice of an error of law apparent on the face of the record. * * *"

In our view of the record the interests of justice do not require that we take notice of the alleged error upon our own initiative; however, in view of the gravity of the charge, we will consider the contention. Part of the objectionable matter is found only in exhibit 2, a transcription of notes taken in Los Angeles on January 26 prior to any confession and it was offered in evidence by the defendant. That statement discloses that the defendant had taken at least ten drinks of liquor during the afternoon and night of the murder. It was in that statement that the following was made to appear:

"A. I don't never have no hard feelings toward anybody, but if I drank whiskey and somebody messed with me—

"Q. Would you say that white woman messed with you on Central Avenue?

"A. She stopped me. She was already banged up. She told me that story.

"Q. Another time you went into a strange house and unlocked the screen door and went to bed?

"A. That was a lady friend of mine on 24th and Evans."

■ The chief contention on this phase of the case relates to portions of exhibit L which, it is claimed, tend to prove other misconduct or crime by the defendant. We will first summarize those portions and then consider their effect. Exhibit L indicates that defendant was asked if he ever killed anyone else on a car; if he ever got in a berth with a woman on a train, put a knife to her throat and threatened to cut her throat if she didn't lie still; and if he didn't have sexual intercourse with a woman on the train. Defendant was also asked if he wanted to have sexual intercourse with Mrs. James. To all of these questions the defendant answered in the negative. As to the foregoing matters, there was no evidence, but only questions which sought evidence, though the questions may some of them have been improper. Ordinarily, the mere offer of improper evidence is not reversible error. *State v. Humphries,* 350 Mo. 938, 169 S. W. (2d) 350. Exhibit L discloses that the defendant told of becoming angry with "a mere school girl" on returning from a dance where she had flirted with another man and that he contemplated hitting her, but did not. It is also claimed that the following portions of exhibit L tended to indicate other offenses and under the well known rule should have been excluded:

"Q. Do you think you would do it again?

"A. If I was to get drunk. I never would do it like that.

"Q. How would you do it the next time.

"A. If I got too drunk—if I got to drinking around in a party—if I was out with a girl or something like that, I know that is what I would do.* * *

* * *

"Q. Whenever you have too much to drink you have a desire to kill, is that right?

"A. I guess so because my wife told me about a month ago, first and last she expected me to kill somebody.

"Q. Why did she tell you that?

"A. I didn't try to find out; I left, but I said, 'Maybe it will be you.' "

Defendant also stated that on one occasion his "wife" stabbed him with an ice pick and he knocked her out. Exhibit L also contains statements of the defendant as to acts of violence which he had seen in the alleys of Los Angeles. The statement was volunteered by him and there is no suggestion that he participated in any such crimes.

Examination of the record at the trial discloses that error, if such there was, in permitting the jury to hear this evidence was invited by the defendant and was cured by instructions of the court. The record discloses that long before the receipt in evidence of exhibit L, the following transpired:

"The Court: We will dismiss the jury until tomorrow. It will take you some time to read that.

"Mr. Seismore: To expedite matters, if I might make this suggestion, as soon as this witness is excused, the State intends to lay the foundation for the introduction of the statement made here in Oregon, which matter could be put on in the absence of the jury this afternoon, and Mr. Lomax could read that statement tonight.

"The Court: As you intend to do that, we will excuse the jury, and you can do that this evening, Mr. Lomax, and the witness can be back on the stand in the morning.

"Mr. Lomax: That is satisfactory."

The next morning, in the presence of the jury, counsel for the defendant said:

"With the Court's permission I have examined those statements, State's Exhibit K and the other statement, and am ready to proceed."

Upon receipt of State's exhibit L, the district attorney announced that he "would like to read State's exhibit L to the jury." The transcript discloses that Mr. Weinrick then began to read State's exhibit L and read until the recess. After recess the reading continued. At one time the reading was interrupted and Mr. Weinrick and Mr. Lomax conferred together.

"Mr. Lomax: You started reading it; you might just as well read all of it."

Mr. Weinrick continued reading:

"Mr. Lomax: I object to the last statement."

Thereupon the court said:

"Read the statement as it appears," and Mr. Weinrick proceeded to read the portion of exhibit L with reference to his quarrel with the school girl in which he "turned around and squared off and drew to hit her and she kind of smiled and I went home."

"Q. You didn't hit her?
"A. No."

He also read the portion of exhibit L wherein the defendant said that his "wife" expected him to kill somebody.

There is nothing in the transcript to indicate whether the objection preceded or followed the first reading to the jury of the objectionable matter for we are left uninformed as to the extent of the reading before the objection was made.

The court then ruled: "I can't shut it out, it is part of that statement." The district attorney then continued the reading of the statement. Upon concluding, counsel for the defendant asked the court to strike from the statement any of the references to altercations with defendant's "wife" or any reference to any other kind of offense. The district attorney stated that there was no objection to that being done. The court then ruled as follows:

"Of course if that motion had been made or objection made at the time of the offer, the Court would have gladly done that and not permitted it to go to this jury, and at this time, although the document has been received in evidence, out of fairness to the defendant I want to say to this jury that those references in that statement concerning any other offense, no matter what it was, major or minor, have no place in this case, and should not be considered by you or anyone of you in making up your minds as to what verdict should be rendered. I am going to eliminate those as far as I can from this statement, either delete them or cut them out and caution the jury not to discuss them in rendering your verdict—any reference to any other offense. This defendant is not on trial for any other offense except that described in the indictment, and that only, and it would be unfair for him to have a jury consider or discuss in the juryroom any other offense, or let it enter into the jury's mind that any other offense was committed. He is not on trial for anything else, and for that reason the motion will be allowed.

"Mr. Lomax: May I make my position clear, your Honor? When your Honor in his wisdom admitted the statement made by the defendant, I intended to ask your Honor at the conclusion of the reading of the statement to so strike, and I believe the jury will follow your Honor's instructions."

Counsel for the prosecution and the defense agreed to get together and delete the objectionable statements within the purview of the court's ruling. Accordingly, a small portion was deleted by excision. Other portions, now thought to be objectionable, were not deleted but counsel for the defense made no request for further deletion and no further objection upon that issue.

Thereafter witness Howard of the Oregon State Police was examined and cross-examined by the defense in great detail. In the cross-examination the defendant covered the material portions of exhibit L, sentence by sentence, asking witness Howard if the defendant had made the various statements, to which Howard answered that he had.

■ It is next urged that prejudicial error was committed because, by reason of the reception in evidence of exhibits K and L instead of their use to refresh recollection, the defendant was deprived of the valuable right of cross-examination. We find no merit in this contention. The two transcripts were each authenticated by the testimony of the stenographers who took the statements. The defendant had full opportunity to, and did, cross-examine each of them. The transcripts were theirs alone, but because other witnesses testified to the fact that these statements were taken and that they did in substance contain statements of the defendant, it is suggested that the defendant was deprived of the right to cross-examine them in relation to the transcripts. None of the officers could testify as to the accuracy of the stenographer's notes except by telling what they themselves heard the defendant say. This they did and the defendant exhaustively cross-examined all who testified to admissions or confessions of the defendant. If the defendant desired to

cross-examine the officers further after receipt of the exhibits, he should have requested that they be recalled to the stand for that purpose. Tetrick, whose testimony covered the substance of exhibit K, was available for that purpose because the record shows that he was recalled to the stand by the defendant after the receipt of exhibit K. Concerning exhibit L, upon its receipt in evidence, the following transpired relative to the availability of witnesses Howard and Beeman:

> "The Court: You may recall them, and you have the right to recall them if the State does not bring it out. You have the right to bring out everything that occurred in that room. They will be available here as witnesses."

Defendant's counsel had already examined exhibit L and both officer Howard and witness Beeman were examined and cross-examined subsequent to his examination of the exhibit, in fact, both Howard and Beeman testified after the receipt of exhibit L and full cross-examination was allowed—much of it relative to the contents of that exhibit.

Lastly, we must consider whether the technical errors heretofore discussed warrant a reversal of the judgment.

> "* * * The materiality and prejudicial character of a given fact must be measured by its relation to the entire case. Of necessity, it cannot be detached and isolated from all of its surroundings and thus measured to determine its prejudicial character. So, the above testimony, as any other, must be considered in its relation to all the evidence introduced. * * *" *Forrester v. State*, 109 Tex. Cr. Rep. 361, 4 S. W. (2d) 966 at p. 968.

■ It is held that the testimony of witnesses for the State may be given full effect by the jury when the

accused fails to take the witness stand. *Reeves v. State,* 159 Miss. 498, 132 So. 331. Where guilt is conclusively proved by competent evidence, and no other rational conclusion could be reached, conviction should not be set aside because of unsubstantial errors. *State v. Evans,* 202 S. C. 463, 25 S. E. (2d) 492, headnote 6; *People v. Vogelgesang,* 221 N. Y. 290, 116 N. E. 977; *People v. Stokes,* 334 Ill. 200, 165 N. E. 611; *Robinson v. United States,* 30 F. (2d) 25; *State v. Rusnak,* 108 N. J. Law 84, 154 A. 754; *People v. Oberholdt,* 359 Ill. 39, 193 N. E. 608.

In the case of *Edwards v. Mt. Hood Construction Co.,* 64 Or. 308, 130 P. 49, the trial judge committed numerous serious errors. Among other things, in the presence of the jury he expressed his opinion of the evidence and told one of the attorneys that his case was "infamous." This court, in affirming the judgment, said:

> "The defendant introduced no testimony whatever, leaving the testimony of plaintiff and her witnesses wholly uncontradicted. The witnesses were not impeached, their testimony was reasonable and probable, and, in the absence of any contradiction, the jury was bound to receive it as true and render a verdict accordingly. Had there been any contradictory evidence introduced, so that a question of the preponderance of evidence one way or the other had been presented to the jury, we should be compelled to reverse this case; but, as it now stands, the evidence is all on the side of the plaintiff, and notwithstanding the errors complained of the verdict must stand." *Edwards v. Mt. Hood Construction Co.,* supra.

In *People v. Oberholdt,* supra, it was held that where the conviction was sustained by competent and uncontradicted evidence of eye witnesses and where the ac-

cused offered no evidence, alleged error in the admission of incompetent evidence was not prejudicial.

It is held that error in admitting incompetent evidence is cured by the introduction of competent evidence to the same effect. *Commonwealth v. Sydlosky*, 305 Pa. 406, 158 A. 154; *Commonwealth v. Bernstine*, 308 Pa. 394, 162 A. 297; *Eaton v. Commonwealth*, 230 Ky. 250, 19 S. W. (2d) 218; *Baker v. Commonwealth*, 223 Ky. 616, 4 S. W. (2d) 416.

In view of these authorities and of an immense mass of similar recent decisions, (see Fourth Decennial Digest Criminal Law, Key No. 1162 et seq.) we turn to the substance of the confession to determine whether, under the peculiar circumstances of this case, guilt was so conclusively proven that no other rational conclusion could be reached.

At the home of Jessie Wilson, no reporter was present. Officers Tetrick and Rasmussen were present. Tetrick testified that the defendant told him that after boarding the train at Portland,

"* * * When he got into car D, he saw a woman sitting on her berth and she asked him where her husband was, if her husband was on the train. He said she evidently thought he was the porter. He said at that time he noticed that she was in berth 13 lower. He said, 'I don't know where your husband is, but I will try to find him for you; if you meet me in the vestibule in about 10 or 15 minutes I will let you know if he is on the train. He said, 'I went back into the dining car. I made no effort to find her husband.' * * *"

He met her later in the vestibule that evening and

"'* * * told her her husband was in the dining car with a bunch of men in conference, and he would be in there shortly.' He said, 'I knew that wasn't true, but I told her that.' * * *"

Officer Rasmussen testified to substantially the same statement relative to defendant's conversations with Mrs. James about her husband. It will be remembered that her husband was not on the train.

Tetrick testified that the defendant said he set his alarm for 3:30 A. M., an hour earlier than usual, and that he said, ''When I woke up in the morning, all that was on my mind was the girl in lower 13.'' He walked through car D, reached into lower 13, ''He put his hand on her body; he made sure she was alone.'' He then went to the smoking compartment and talked with porter Hughes. (This is confirmed by the testimony of Hughes.) He then returned to the dining car. Tetrick testified:

> ''At that time he had on his white jacket, his striped pants and he went back into the dining car and got a knife, and put the knife in his sleeve and came back in car D, * * *''

In the aisle he met Chief Petty Officer Kelso and directed him to the men's smoking room. (This is confirmed by the testimony of witness Kelso.) He then returned to the dining car where he sharpened a knife on a steel. ''Then it came to his mind to disguise himself so that if anyone saw him they wouldn't recognize him. He took off the white jacket and put on an overcoat. He put the knife in the pocket of his overcoat and went back to this car D.''

Officer Rasmussen testified to the same facts which we have quoted and summarized from the testimony of Tetrick. Witnesses Wilson, Conner and Norton, who saw the murderer flee from car D, verify defendant's

confession concerning the dark overcoat. Tetrick's testimony continues:

"* * * When he got back to berth 13 lower, he stepped inside the berth. He said, 'I thought I had all the buttons unbuttoned,' but he found there was one button still unbuttoned. He stepped over that button and stepped in the berth and tried to button the buttons behind him. He said he was unable to do so, and it came to his mind to make the woman button the buttons. He thought maybe somebody would see his shoes and pants below the curtain, and that would be bad. So he climbed on top of the woman, astraddle of her. He put one knee over her, and as he did she woke up. He said at this time he would like to describe the way the woman was lying. She was lying on her back with the bed clothing up just under her arm pits, and her right side to the curtains. He said when she woke up, she said, 'Who are you?' He said, 'I put the knife against her throat, and said, "It makes no difference." "Button those buttons." ' She said, 'What do you want?' He said, 'It still makes no difference; now button those buttons or I will cut your throat.' He said she reached over with her right hand to button the buttons, and as she did she threw her body in an effort to throw him out of the berth. He said he was still unsteady and a little drunk from the night before, and he said to her if she did that again he would cut her throat. He said, 'Button those buttons, and no fooling.' He said she reached over her right hand and as she crossed her left she throwed her body again. He said at that time he cut her. He said he had a knife in his right hand, and he made one cut. * * *"

He then got out of the berth and ran to the dining car. He put grease in the stove and lighted the fire, and "had so much grease in there the flames shot way out of the stove." He then proceeded to prepare pies and muffins and by that time the marine came in and told

him there had been a murder. This is verified by the testimony of Wilson, the marine, and Tetrick's entire narrative of the admissions of the defendant is covered in all substantial particulars by the testimony of officer Rasmussen. Tetrick testified the defendant then said:

> "That is my story; I am the killer and you have your murderer, and now can I have a drink?"

Defendant also told to the officers a wholly incredible story to the effect that a man had offered him $1,000 if he would kill a woman. He was unable to describe the man because "the man had an overcoat on and a mask."

The officers testified that he told his mother over the phone that he was the killer. This, as we have said, was denied by the mother.

Comparison of the confession made to the officers in the home of Jessie Wilson with the confession which appears in the transcript exhibit K discloses that the unobjectionable evidence concerning the first confession is substantially the same as the confession contained in exhibit K to which objection is made. Exhibit K is too long to be fully set forth in this opinion. We quote but a small portion:

> "It was again brought to my mind about this lower berth 13. The first thing that went to my mind again was when I staggered over to the bench where my knives are kept. I grabbed the knife, I grabbed the steel, I whet this knife and tested with my left thumb. * * * I then made one more trip to the car to make sure the car was clear. It was clear alright enough. I then went back to the kitchen. I unlocked the kitchen again and looked at my white jacket and it occurred to me to disguise myself in case anything of my identity was shown. I got a coat from the closet, I put it on with my regular

work clothes and everything except my jacket.
\* \* \*''

He made approximately three trips through car D. On one of them, he met Petty Officer Kelso who was looking for the men's restroom, but was headed the wrong way. The defendant directed him to the room. His statement continues:

"\* \* \* I walked back to the tourist car. Nothing was behind me and I could see everything in front. I ran my hand inside of the curtain and unbuttoned one button. I walked on, all the way to the end of the tourist car where Hughes and the Petty Officer was. I made another return and walked back towards the dining car in this same car 'D'. I walked again up there and unbuttoned another button of berth 13. After I unbuttoned this I thought it was the last, I made another trip. I heard this petty officer's razor zizzing. I did not hear them holding any conversation, so I drew from my own conclusion that he was shaving and evidently Hughes was laying on his couch or bench. Then I went back through the car towards the diner. I made one more trip to this berth, I entered the berth with my left knee. Somebody raised up from that berth and asked who was I, as I can fairly remember. It was all in a fog to me. I said, 'It does not make any difference.' She immediately asked me what I wanted. I again said, as I can remember, I said, 'It still makes no difference.' I said, 'Button these curtains' once again. It was a lady true enough. She buttoned the curtain. She acted as if she was going to button them, which I felt she had more power than I. She reached first with her right hand then with her left, but evidently in my mind I figured she was not going to do that and there is where I killed her.

"Q. At the time she reached were you astride of her?

"A. I do not know. I do not think I ever did. Yes, I sat on top of her.

\* \* \*

"Q. How did you kill her?
"A. I guess I cut her.
"Q. Do you remember where you cut her?
"A. Yes, sir.

\* \* \*

"Q. Was it about her head?
"A. I think it was her head.
"Q. How many times did you stab her?
"A. I think it was only once.

\* \* \*

"Q. What did you do after the killing, did you run?
"A. Did I run? I run."

In support of exhibit K and the testimony of Nancy Lyman, witness Tetrick testified that the statement taken by Nancy Lyman was "practically the same statement he made the night before," with the exception that the defendant did not mention having been hired to do the deed.

We next quote a few excerpts from the forty-seven-page transcript exhibit L which was taken by the court reporter, Kathleen Miller, in Albany, on January 31.

"Q. But you did tell her to button the curtains, didn't you?
"A. Yes, but I never heard no reply.
"Q. Did she act as though she was going to button the curtains?
"A. Yes, but I kind of figured it was a phony.
"Q. You mean you didn't think she was going to button them?
"A. No, I didn't figure she was going to.
"Q. Where was the knife at that time?
"A. It was - - -

"Q. It was on her throat?
"A. Yes, sir."

In the course of the questioning by Lieutenant Howard, the transcript indicates that Dr. Beeman lay down upon some chairs and the defendant demonstrated upon him the manner in which the murder was committed. In the course of the demonstration, the following conversation was had:

"A. Then I did like that with my knee like that and touched her.
"Q. You brought your knee up to the lower berth and touched her.
"A. Yes, sir.
"Q. Then what did she do?
"A. Then she rose up and my knee was in this position.
"Q. Your knee was up against her abdomen?
"A. Yes. And as she rose like that she said, 'What do you want?' and I said to her, 'It makes no difference', and she said, 'Who are you?' and I said, 'It makes no difference.' And I placed it like this.
"Q. Do just like the way you did. With your fingers under her chin?
"A. With my hand over her mouth.
"Q. Put it exactly as you did.
"A. I put it like this. She turned her head this way.
"Q. She turned her head toward the aisle?
"A. Like this, and I cut her here, I think."

It is, we believe, undisputed that no error was committed in receiving the testimony of officer Howard concerning the defendant's statements in Albany. We quote brief portions of it. Dr. Beeman had shown the defendant pictures of the deceased. Witness Howard testified:

"* * * Dr. Beeman showed the defendant the cut on the neck of the deceased and asked the defendant if he remembered striking a bone. The de-

fendant said he did. He then denied making such a statement. We continued to talk to the defendant. He seemed very willing to talk, and I told him he had violated one of the ten commandments, and he said, 'Yes, "Thou shalt not kill." ' * * *"

In the course of the investigation, witness Howard left the room for a few minutes. He testified:

"* * * Upon my return to the courtroom Dr. Beeman advised me that the defendant had signified his desire to tell us the truth of the murder, and had admitted his guilt.

"Q. Was the defendant Folkes present when Dr. Beeman made that statement?

"A. Yes, sir.

"Q. You may proceed.

"A. I asked the defendant if it was true that he had made such a statement and signified his desire to tell us the truth, and he told me that it was. * * * The defendant then related the details of the murder orally to Dr. Beeman and myself and later made a written statement.

* * *

"A. * * * He stated that he had gone to the dining car into the galley after seeing Mrs. James and had sharpened a French knife and a boning knife. That the boning knife that he had sharpened was the one he used in the slaying of the deceased. * * *"

The detailed testimony of witness Howard concerning statements of the defendant relative to the period immediately preceding the murder is substantially the same as the other statements which we have already summarized. Witness Howard then demonstrated before the jury upon the body of the sheriff the manner in which the defendant had demonstrated the crime

upon the body of Dr. Beeman on the evening of January 31.

"A. He said that when he cut the deceased, he had the knife in his right hand. That when he first entered the berth that he had pointed the knife away from her body to keep from cutting her; that when she made a movement which indicated to him she was going to make an outcry or force him from her berth, he turned the knife blade and pointed it at her throat; that when she then made another movement which indicated to him that she was going to try to force him from the berth, that he had cut her. He said that he was holding the knife in this position with the blade extending downward and forward; that he had started at the mid line of the neck and had gone toward the rear. At the time he showed us how he had done this, he was very definite in showing that there was four distinct jerks or motions. He showed us in this manner. (Illustrating) Four very distinct movements or jerks.

"Q. The defendant was demonstrating that upon whom?

"A. Dr. Beeman.

"Q. And was the Sheriff in the same position in which Dr. Beeman was at that time?

"A. Approximately so, yes. The chairs when the defendant was demonstrating were facing in this direction in the small courtroom. This is supposed to be the front of the train.

"Q. Will you demonstrate to the jury what, if anything, the defendant Folkes did with his left hand.

"A. Yes, he placed his left hand over the deceased's mouth in this manner when he cut in this other manner."

On cross-examination, counsel for the defendant repeatedly and at length quoted incriminating portions from exhibit L to witness Howard, asking him if the defendant had made the statements quoted and Howard

answered in the affirmative. If exhibit L was improperly admitted, the testimony of Lieutenant Howard covers, in substance, the same confession and that without error.

Dr. Beeman, an officer in the Oregon State Police and a member of the faculty of the University of Oregon Medical School, testified that the defendant, in the absence of Lieutenant Howard, "briefly told me that whenever he got drunk that he heard voices and then described briefly the details of the killing of Mrs. James." He added that there was further elaboration of the statement when Lieutenant Howard returned and that a subsequent statement was taken in writing. Dr. Beeman performed the autopsy, described the wound upon the neck of the deceased as follows:

"* * * Starting below and behind the left ear at just about the collar level and at a point where I am pointing, approximately, with my pencil, was a wound made with a sharp instrument which was 1⅝ inches long and went downward. Directly connected with this wound was a second part of the cut in the neck two inches long which ran upward. The third part of this wound ran downward for 1⅝ inches— pardon me, 1¾ inches, and the fourth part ran upward for 1⅝ inches and ended ½ inch to the right side of the center of her body. * * *"

The description of the wound confirms the accuracy of the defendant's statement to Lieutenant Howard as to the manipulation of the knife in four distinct jerks. Dr. Beeman testified that the defendant made the same statement essentially three times.

The defendant was conclusively proven guilty by his own confession corroborated by other unimpeached and uncontradicted evidence. We therefore hold that the receipt of incompetent evidence which would have war-

ranted a reversal under other circumstances, did not constitute reversible error here. This view is strongly fortified by a line of decisions from the Supreme Court of Illinois, subject to a single qualification which is peculiar to that state. In *People v. Stover,* 317 Ill. 191, 148 N. E. 67, incompetent written confessions were received in evidence.

> "The object of the review of judgments of trial courts by courts of appellate jurisdiction is not to determine whether the record is free from error, but is to ascertain whether a just conclusion has been reached, founded upon competent and sufficient evidence, after a trial in which no error has occurred which might be prejudicial to the defendant's rights. This defendant on his own statement was guilty of burglary. There was no evidence of a single fact tending to raise any doubt of his guilt except evidence of his good character, and this, in face of his own admission as to the facts, could not possibly raise a doubt of his guilt. Therefore the incompetent evidence, which would have been sufficient to reverse the judgment if there had been any attempt to show a valid defense, was not prejudicial to the defendant, who did not attempt to present a defense. A defendant who is fully proved guilty by his own confession, which he does not deny or attempt to invalidate, has no right to complain of error in the trial where the verdict of guilty has nothing to do with the fixing of the penalty or the grade of the crime." *People v. Stover,* supra, and see *People v. Taylor,* 319 Ill. 174, 149 N. E. 797; *People v. Schueneman,* 320 Ill. 127, 150 N. E. 664; *People v. Guilfoyle,* 321 Ill. 93, 151 N. E. 596.

▆ The limitation of the Illinois rule to cases in which the verdict has nothing to do with the fixing of the penalty, apparently was inserted in the Illinois decisions because of a statute then in effect whereby the jury was required to fix the period of confinement in

many criminal cases. Jones Ill. Stats. Ann. § 37.742, vol. 8, Repealed L. 1943, vol. 1, p. 589. The Illinois Constitution contains no provision similar to Art. VII, § 3 of the Oregon Constitution hereinafter cited. While in Oregon the jury may ameliorate the punishment by recommending life imprisonment, the death penalty, in the absence of any recommendation, is made mandatory by provision of Art. I, § 37, Oregon Constitution.

Our authority to disregard technical errors is based on O. C. L. A. § 26-1325; *State v. Moore,* 124 Or. 61, at p. 66, 262 P. 859; *State v. Yee Guck,* 99 Or. 231, 195 P. 363; *State v. Chin Ping,* 91 Or. 593, 176 P. 188; *State v. Reed,* 52 Or. 377, 97 P. 627; *Edwards v. Mt. Hood Construction Co.,* supra, and see 3 Am. Jur. § 1005, p. 560 and § 1028, p. 580. Our authority to affirm this conviction rests not alone on statute, but also on the express provisions of the Constitution:

"* * * If the Supreme Court shall be of opinion, after consideration of all the matters thus submitted, that the judgment of the court appealed from was such as should have been rendered in the case, such judgment shall be affirmed, notwithstanding any error committed during the trial; * * * provided, that nothing in this section shall be construed to authorize the Supreme Court to find the defendant in a criminal case guilty of an offense for which a greater penalty is provided than that of which the accused was convicted in the lower court. [Initiative amendment, section 3, approved 8th November, 1910 * * *] Art. VII, § 3, Or. Const.

"This amendment blazes the way to true justice in this case and in like cases." *State ex rel. Burghart v. Haslebacher,* 125 Or. 389, 266 P. 900; and see *State v. De Jonge,* 152 Or. 315, 51 P. (2d) 674 (referring to the "salutary mandate" of Art. VII, § 3 of our consti-

tution); *State ex rel. v. Bartlett,* 141 Or. 560, 18 P. (2d) 590; *State v. Metcalf,* 129 Or. 577, 278 P. 974; *State v. Burke,* 126 Or. 651, 269 P. 869, 270 P. 756; *State v. Ragan,* 123 Or. 521, 262 P. 954; *State v. Karpenter,* 120 Or. 90, 250 P. 633, 251 P. 307; *State v. Newlin,* 92 Or. 589, 182 P. 133; *State v. Morris,* 83 Or. 429, 163 P. 567; *State v. Friddles,* 62 Or. 209, 123 P. 904. The purpose of Art. VII, § 3 was:

> " 'To simplify procedure on appeals to the Supreme Court and remove the pretext for new trials in those cases in which substantial justice is done by the verdict and judgment, but in which the trial court may have made a technical mistake.' " Statement, Voters' Pamphlet 1910, p. 177.

O. C. L. A. § 26-1325 requires the court to "give judgment without regard to the decision of questions which were in the discretion of the court below or to technical errors, defects or exceptions which do not affect the substantial rights of the parties." By that section we are required to identify and disregard technical errors; but by the provisions of Art. VII, § 3, we are empowered to consider all matters submitted and "if the Supreme Court shall be of opinion that the judgment * * * was such as should have been rendered in the case, the judgment shall be affirmed * * *."

In the absence of constitutional provision, the common law test as to the existence of prejudice is often stated as depending upon whether the verdict of the jury would have been the same had there been no error, although more liberal tests have also been applied. We believe the verdict would have been the same had no error been committed in the case at bar, but the constitutional test is plain and explicit. It does not involve a vague psychoanalysis as to what the jury would have

done. The test is whether, *in the opinion of the Supreme Court* the judgment should be affirmed. The judgment which may thus be affirmed incorporates the finding of guilt by the jury and the pronouncement of the mandatory sentence by the court. If we were of the opinion, on examination of the entire record, that the defendant did not have a fair trial before the jury, an entirely different question as to the applicability of Art. VII, § 3, would be presented.

██ ██ It is urged that Art. VII, § 3, was either amended or repealed by implication by Art. I, § 37, which provides that the penalty for murder in the first degree should be death except when the trial jury recommends life imprisonment. There is certainly no inconsistency on the face of the two sections—the one relates to procedure in the trial court, the other to the powers of the supreme court. Art. VII, § 3, is a remedial provision adopted in the interest of prompt justice. Repeals by amendments and repeals by implication are not favored. *Noble v. Noble,* 164 Or. 538, 103 P. (2d) 293; *Cabell v. City of Portland,* 153 Or. 528, 57 P. (2d) 1292; 59 C. J. § 434, p. 857 and § 610, p. 905.

Reliance on behalf of the defendant is placed upon the decision of *People v. Meisner,* 311 Ill. 40, 142 N. E. 482, and some similar cases cited in the dissenting opinion of Mr. Justice ROSSMAN. In the Meisner case, the court said:

"Even if it could be said that so far as Meisner is concerned the evidence that he was guilty of murder was so complete that without regard to the incompetent evidence there could have been no other verdict than guilty, it cannot be said that the evidence was not prejudicial to him. The jury had the right to fix the penalty, and they did fix it at the

extreme limit authorized by law. Nobody can know what the jury would have done if they had fixed the penalty on the evidence of this crime alone. * * *''

No constitutional provision such as Art. VII, § 3, of the Oregon Constitution was involved in the cases cited, nor was there any statute involved similar in terms to the provisions of Art. VII, § 3.

 As we have indicated, we think the verdict would have been the same had no error been committed. But if it be said, as in the Illinois case, that we cannot *know* what the jury would have done, nevertheless we do know what they did. They found the defendant guilty of first degree murder without recommendation. We know that the judgment rendered upon that verdict was mandatory and we are ''of opinion, after consideration of all the matters * * * submitted, that the judgment * * * was such as should have been rendered in the case * * *.'' We are therefore authorized to affirm it.

The characteristic feature of this case, it must always be remembered, is that the error in receiving exhibits K and L in so far as they relate to the crime charged was in the manner by which the information was conveyed to the jury, not in the substance of the confessions set forth in those exhibits and, most important of all, it must be remembered that there were repeated, detailed, voluntary confessions of guilt the making of which is wholly undenied.

Under these circumstances, and in conformity with the provision of the fundamental law, we have considered all matters submitted, have examined the whole testimony and are of the opinion that the judgment of the court appealed from was such as should have been rendered in this case. A trial is no longer a game of

wits, it is a search for truth and justice. We have found truth in the evidence of the prosecution and justice in the judgment of the court. The judgment is therefore affirmed.

BELT and HAY, JJ., concur in this opinion.

BAILEY, C. J., concurs in the result.

---

BELT, J., specially concurring:

That the defendant cut the throat of this young woman when she resisted his attempt to rape her is established beyond reasonable doubt. There is only one reasonable deduction to be drawn from the evidence and that is the guilt of the defendant. There is not a scintilla of evidence challenging the truth of the confessions. Neither is there any evidence tending to show that such confessions were not freely and voluntarily made.

Furthermore, aside from the written statements introduced as confessions, there is uncontradicted testimony of witnesses of unquestioned integrity that defendant orally confessed to them the commission of this fiendish and brutal crime.

I agree that technical error was committed in receiving the transcript of confessions in evidence, but I fail to see wherein the rights of the defendant were prejudiced. It is not every technical error that warrants a reversal. If there were the slightest doubt about his guilt, I would unhesitatingly concur in a reversal of the judgment of conviction but, since there is none, it should be affirmed.

Defendant had a fair and impartial trial. It is true that he was not, under the Constitution, obliged to take the stand and tell what he knew about the case—as

any innocent man would be glad to do—but he should not be permitted to remain mute and then, when convicted, urge technicalities to escape the consequences of a just verdict.

LUSK, J. (concurring).

I concur in the affirmance of the judgment. The opinion of Mr. Justice Brand adequately covers all the questions raised by the defendant as well as others not so raised, and I should be content merely to record my concurrence, without more, were it not for the fact that there are views expressed in the dissenting opinion of Mr. Justice Rossman, which, it seems to me, call for specific discussion.

It might be well first to state what this case is about as it comes to this court.

The defendant was convicted by a jury of the crime of murder in the first degree. The jury did not exercise its privilege of recommending life imprisonment as punishment, and judgment of death automatically followed. From that judgment the defendant has appealed. The contention of his counsel, as set forth in the briefs filed in this court, is that the defendant was improperly convicted for three reasons, and three reasons only, namely, that certain confessions made by the defendant were involuntary and, therefore, that evidence of them was improperly received; that the stenographers' transcribed notes of two of such confessions were improperly admitted in evidence; and that the court erred in failing to instruct the jury that the oral admissions of a party are to be viewed with caution.

I desire to emphasize the point that these are the only questions raised by the defendant. It is not he, speaking through his counsel, who claims that he has

been prejudiced by the admission in evidence of statements regarding other offenses found in the Albany confession. The defendant's counsel is no tyro, but a lawyer of large experience in the trial of criminal cases. If, in a case like this, he thinks these matters of so little significance that he has not even mentioned them in this court, either in his briefs or on the oral argument, I see no reason why any of us should be astute to discover, *sua sponte,* errors committed against the defendant where he claims none.

For this is not a case where one need have any apprehension that justice has miscarried. The judgment here is supported by the competent evidence of four unimpeached, uncontradicted witnesses that the defendant confessed in their presence that on the morning of January 23, 1943, between three-thirty and four-thirty o'clock, he entered the berth of a Southern Pacific Railway car in which Mrs. James lay asleep and murdered her by cutting her throat with a knife which he had sharpened immediately before the commission of the crime. It was murder in cold blood, so devoid of any circumstances that might appeal for mitigation to even the most merciful heart, that any other verdict than that which the jury returned would be inconceivable.

The defendant made no attempt to meet this evidence of the prosecution. Almost the sole effort on his part in the court below was to keep out the state's evidence that he had confessed. His only contention now, apart from his complaint that the court erred in failing to give the cautionary instruction, is that the evidence was improperly received. That contention, in my opinion, as it relates to the testimony of Captain Rasmussen and Lieutenant Tetrick, of the Los Angeles

Police, concerning the confessions made by the defendant at Los Angeles, and the testimony of Lieutenant Howard and Dr. Beeman, of the Oregon State Police, concerning the confessions made by the defendant at Albany, is wholly devoid of merit. No decision of this court has been cited, nor, I venture to say, can any be found, supporting a holding that the trial judge, in view of the evidence before him, did not rule correctly in admitting the confessions as testified to by these witnesses. The dissenting opinion says nothing to the contrary, and I take it that on that point all the members of this court are in agreement. The features which distinguished this case from *Ashcraft v. Tennessee,* 322 U. S. 143, 64 S. Ct. 921, 88 L. Ed. 1192, are clearly developed in the opinion of Mr. Justice BRAND. The rule of *McNabb v. United States,* 318 U. S. 332, 63 S. Ct. 608, 87 L. Ed. 819, and *Anderson v. United States,* 318 U. S. 350, 63 S. Ct. 599, L. Ed. 829, has never been the law in this state, is not binding on us, since it is not based on constitutional grounds, and, in my opinion, ought not to be adopted, notwithstanding the deference due to decisions of our highest court. The test of the admissibility of a confession in this state is, and has always been, that it must be voluntary. This is so well known that it is not necessary to cite authorities to support it. We have never held that a confession was inadmissible in evidence simply because it was obtained by officers while they were violating their duty to take the accused before a magistrate. Adherence to such a rule would, in my opinion, place unnecessary obstacles in the way of the detection of crime and result in the acquittal of many a guilty man. This is a case in point, because, without the defendant's confessions, he would go scot free.

But it seems to be the position of Mr. Justice Ross-MAN that, in so far as this court is concerned, Howard's testimony alone is entitled to consideration. There are said to be circumstances which "call into question the credibility of Captain Rasmussen and Lieutenant Tetrick". "Dr. Beeman", it is said, "disclosed very little of what the defendant said in his presence concerning the death of Mrs. James. His brief references to the defendant's statements render it impossible to know whether the defendant admitted the commission of any crime." And it is argued that, "Of course, where error has been committed, no court ought to refrain from ordering a reversal, carrying with it a right to retrial before a jury, unless the evidence produced by the state is so strong that it possesses an unusually high degree of cogency."

With the last statement I am inclined to agree, and I propose to examine the criticisms of the evidence of Rasmussen and Tetrick and to show what testimony Beeman gave respecting the defendant's admissions for the purpose of determining whether there is any good reason for doubting the cogency of the proof of guilt.

It may be well to state first what the record discloses about the history of these four witnesses. Vernon Rasmussen has been an officer in the Los Angeles Police Department for over nineteen years, and for over three years has been captain of the homicide squad, with seventy-five men working under him. He holds the degree of Bachelor of Laws from the University of Southern California and is instructor in criminal law at that institution. E. A. Tetrick has been a member of the Los Angeles Police Department for sixteen years and is a lieutenant, working in the homicide

squad. Ray G. Howard has been a member of the Oregon State Police since 1931 and is a lieutenant in that organization. A fourth witness to the confessions, whose credibility, however, is not questioned, is Joseph Beeman, who is by profession a physician and surgeon, a graduate of the University of Oregon Medical School, with post-graduate training in pathology. He was admitted to practice medicine in Oregon in 1938, is director of the Crime Laboratory Department of the Oregon State Police, and as a member of the faculty of the University of Oregon Medical School is instructor in toxology and pathology, the latter including the course in medical jurisprudence. So far as anything in the record reveals, they are all trustworthy men, and competent in their business of bringing criminals to justice. Nothing discreditable in the lives of any of them was attempted to be shown.

Among the circumstances which are said to call into question the credibility of Rasmussen and Tetrick, to the extent that this court should cast their testimony aside when it is considering the cogency of the proof of guilt, are, that they are contradicted by Jessie Wilson and by Clara Folkes, the defendant's mother, in several particulars, namely: that Jessie Wilson and Clara Folkes testified that the defendant was drunk at the former's house; that Clara Folkes denied that the defendant told her that he had killed anybody; and that Jessie Wilson denied that her body was used by the defendant in demonstrating the manner in which he had killed Mrs. James.

It is true that in her testimony the defendant's mother denied that the defendant told her he had killed anyone. But the important question for this court is whether there is any substantial reason for

doubting that the defendant voluntarily confessed his crime in the presence of Rasmussen and Tetrick. Of this fact there is no contradiction in the record. I can find no unequivocal testimony from any source that the defendant was intoxicated in Jessie Wilson's room when he confessed. Whether the defendant became intoxicated later is immaterial. There is corroboration coming from Jessie Wilson herself that he did confess, because she testified that the officers "took down the confession".

Rasmussen and Tetrick swore that the defendant was not permitted to have a drink until after he had confessed. The defendant himself did not testify. Jessie Wilson, the only other person present, was not asked whether the defendant took a drink or became intoxicated before he confessed, and volunteered nothing upon that subject, and it is clear to my mind, from reading her testimony, that in the questions framed by counsel for defendant, that issue was evaded. The most that can be gotten out of Jessie Wilson's testimony is that at sometime during the course of the evening the defendant became intoxicated. The defendant's mother testified that he was drunk when she arrived at Jessie Wilson's house, but that was concededly after he had confessed.

In this connection it should be observed that on the morning of January 27, at a time when there is no suggestion that the defendant was drunk or that he was acting under the influence of threat or promise the following took place according to the uncontradicted testimony of Officer Tetrick:

"He (the defendant) made practically the same statement he made the night before, with the excep-

tion of naming that supposed man that had offered him $1000.00.''

\* \* \*

''Then Finneran and I and Folkes were there alone. The girl had stepped out of the room, and I asked him, I said, 'Bob, why did you kill that girl; why did you get in the berth with her?' and he said, 'Why, I saw her standing there, and she looked like my type of woman, and I just couldn't get her off my mind.' ''

With reference to the claim that Jessie Wilson contradicted the officers concerning ''demonstrations'' on her body, the record shows that Rasmussen previously had testified that the defendant showed upon Jessie Wilson the manner in which he pulled the knife across his victim's neck, and in doing so put one leg practically on top of Miss Wilson's body while she was lying in bed and took a pencil and showed a cut across the neck. The officer, in his testimony, did not use the word ''demonstrate'' or ''demonstrations'', and Jessie Wilson's attention was not specifically called to his testimony. I think it is fair to say that it is extremely doubtful whether she understood that she was being asked about the truth of his testimony in this respect when the following question was put to her:

''Q. Were any demonstrations conducted there? I refer to any demonstrations upon your body in any manner whatever.''

To this she answered ''No''; and that is all there is on the subject.

It is further said, ''How it happened that the trip was made to Miss Wilson's house also calls into question the veracity of the officers''. The reason given for this statement is that the officers testified that

the defendant several times asked to be taken to Jessie Wilson's house, and that Exhibit 2, which consists of the transcribed notes of a statement given by the defendant in Los Angeles on Tuesday afternoon in which he was protesting his innocence, contains no reference to such a request. The record with respect to this contention is as follows:

Lieutenant Tetrick testified that about 2:00 P. M. on January 25, 1943, he was in a room in the city hall in Los Angeles with some other officers and the defendant; that Miss Bechtel, a stenographer, was brought in and they started to take a statement from the defendant, but the defendant stopped and asked to be taken to the toilet; that he went to the toilet with the defendant, and it was there that the defendant requested that he be taken to his house so that he could talk to his wife, get a drink of whisky and have something to eat, promising that then he would tell more about the case. Captain Rasmussen testified that on the morning of January 25 and the morning of January 26, and again at about five o'clock in the afternoon of January 26, the defendant asked to be taken to his home, the last time in the following language:

"If you will take me to my home on East 25th Street and let me talk to Miss Taylor (another name used by Jessie Wilson) I will tell you exactly what happened, and I will give you the murderer."

On this last occasion, which was in Rasmussen's office, several officers being present, the defendant said that he wished to speak to Rasmussen alone. Thereupon, on Rasmussen's suggestion, the other officers left and the defendant then made the request to which the officer testified.

Tetrick differs with Rasmussen as to the hour of the evening of January 26 when the defendant talked to Rasmussen alone. He testified that "at seven o'clock he (the defendant) kept insisting on going out there" (i. e. to Jessie Wilson's house), and that he took the defendant to Rasmussen's office and "let him talk to Captain Rasmussen alone".

Exhibit 2 was introduced in evidence by the defendant himself and contains the only evidence in the case of the time when it was taken. It recites at its beginning that it was taken at 5:15 P. M., January 26, 1943, and that the stenographer who took the notes of the defendant's statement and transcribed them was Jean Bechtel.

The foregoing review of the evidence discloses that on six separate occasions, the first being on the morning that the defendant arrived in Los Angeles, he requested of one or the other of the officers that he be taken to the home of Jessie Wilson, and that Jean Bechtel was not present on any of these occasions. The fact, therefore, that there is no mention of this request in her transcribed notes is without significance. It is a very inadequate reason, as I view it, for the attack on the officers' testimony.

It is true that, with respect to incidental and unimportant details, the officers are not in exact agreement as to everything the defendant told them. Had they been, it might have afforded reason for suspecting that they had gotten together and agreed on a story, in which case their credibility would have been affected. The defendant's story was a detailed account of his actions from early in the evening of January 22, 1943, until about 4:00 A. M. of the following morning. It would not be strange if two honest men who heard

that story, attempting to retell it some two months later, should not be in perfect accord as to its every particular. But in respect of the defendant's unforgetable account of the murder itself, and his preparation for it, Rasmussen and Tetrick are in substantial agreement, and Howard, who heard the same story from the defendant later, is in substantial agreement with the Los Angeles officers.

As to Dr. Beeman, it is true that he was not asked to repeat the defendant's confession, made in the presence of himself and Howard, and to which Howard testified in some detail. The record, however, shows the following from Dr. Beeman's testimony:

"Q Did the defendant make any statement to you regarding his connection with the crime in issue here?

"A Yes, sir.

"Q And what was the occasion of the first statement of that kind by the defendant?

"A Lt. Howard had left the room, leaving the defendant alone with me and—no, the first statement in regard to the crime was at one time we asked him if he struck any bone on the neck of Mrs. James and he stated he had and immediately retracted that statement."

\* \* \*

"Q What occurred at that time?

"A Lt. Howard left the room and left me alone with the defendant, and I suggested to the defendant that he might be mentally sick, and he then asked me two or three questions and briefly told me that whenever he got drunk that he heard voices and then described briefly the details of the killing of Mrs. James."

At this point it seems desirable to set forth the substance of the confession made by the defendant to

Howard and Beeman, as testified to by the former. Howard swore that the defendant made a statement to him and Dr. Beeman before Exhibit L was taken, and he pointed out in great detail minor discrepancies between the first and second statements. His testimony covers the conduct of the defendant as related by him from the time he became intoxicated on the evening of January 22 in a hotel in Portland until he entered Mrs. James' berth and cut her throat. It includes the defendant's statements that he talked to Mrs. James at her berth; that he then went to the galley and sharpened a French knife and a boning knife; that the boning knife was the one he used in killing Mrs. James; that he set his alarm for 3:15 A. M., and, on awakening, lay in his berth "thinking about the occupant of Lower Berth 13". It goes on with an account of the defendant's movements in Car D and his encounters with Porter Hughes and Chief Petty Officer Kelso, and tells how he obtained a knife from the galley and unfastened the buttons of the curtains to Mrs. James berth, and got his overcoat and put it on "for the purpose of concealing his identity", and entered Mrs. James' berth. That is the substance of what Howard testified the defendant told him occurred before he killed Mrs. James. Then Howard, using the body of the sheriff on which to demonstrate, described in minute detail how the defendant cut his victim's throat, as the defendant, using Dr. Beeman as the subject, had demonstrated and described the crime to Beeman and Howard.

In addition to the foregoing, as pointed out in the opinion of Mr. Justice Brand, on cross-examination Howard was asked by counsel for the defendant concerning many of the statements admitting guilt which

are found in Exhibit L, and affirmed the fact that these statements were made by the defendant.

I do not suppose it would be argued that Beeman's testimony above quoted means that the defendant described the killing of Mrs. James by any other person than himself; and I think it not open to doubt that the "details of the killing" were the same details to which Howard swore.

If a voluntary confession be of any value as proof of guilt—and to my mind it is evidence of the highest order—then it would seem that the proof of the defendant's guilt of murder in the first degree is not only cogent but absolutely conclusive. What should be said about the case, if it depended on Howard's testimony alone, need not be discussed; four witnesses, as the foregoing review of the evidence demonstrates, testified to the confession; they were not contradicted or impeached; there is no evidence to the contrary. In addition, Jessie Wilson, the defendant's paramour, called by him as a witness, testified that in her room the officers "took down the confession." In addition, also, the confession itself is corroborated in significant particulars by the uncontradicted evidence of witnesses who were in the Pullman car when Mrs. James was murdered—not the least important of which is the testimony of three witnesses that the murderer wore a long overcoat. The defendant, it will be remembered, told the officers that before the crime he put on his overcoat in order to conceal his identity.

Our authority to examine the whole testimony and to determine therefrom whether the evidence of guilt is so conclusive that errors occurring on the trial, which otherwise might be ground for reversal, ought to be disregarded, is sustained by numerous decisions, some

of which are cited in the opinion of Mr. Justice BRAND; and it is in the setting of a case where the only denial of guilt is by a formal plea of not guilty that we are called upon to consider the errors relied on by the defendant and to determine whether we should, on our own initiative, notice other alleged errors which the defendant has not, apparently, deemed of sufficient importance to call to our attention.

In my view it is an unwarranted construction of the opinion of the majority to say that it deems the contents of the erroneously admitted stenographers' transcripts of the defendant's confessions highly reliable sources of the truth. The question whether the defendant was prejudiced by their admission in evidence cannot be intelligently discussed or rightly determined without referring to their contents, and, when it is shown that the confession of the defendant contained in these exhibits is in substance the same confession that the two officers from Los Angeles testified to and that Lieutenant Howard and Dr. Beeman of the Oregon State Police testified to, and it is further shown that their testimony stands undenied, that Jessie Wilson did not deny that he made the confession in her room to which the officers from Los Angeles testified, but swore instead that "they (the officers) took down the confession"—then it may be concluded that the rights of the defendant were in no way substantially affected by a ruling of the court which permitted proof *in the wrong manner* of facts which were established in the right manner. The purpose of considering the contents of State's Exhibits K and L is to show that they contained evidence that was relevant and material; that is to say, evidence of the defendant's confessions which were otherwise established by com-

petent proof and remain undisputed in the record. From that the conclusion rightly follows, in my judgment, that the error in admitting these documents was not, and could not have been, prejudicial to the defendant's interests—a conclusion which becomes the more apparent when it is considered that had the state followed the technically correct method of proof, the very evidence which we find it necessary to hold incompetent would have been properly before the jury.

As to the failure of the court to give the cautionary instruction concerning the oral admissions of a party, in addition to the reasons stated in the opinion of Mr. Justice BRAND, I think that the error was not prejudicial because no jury having regard to its oath could have come to any other rational conclusion than that the defendant, not once, but several times, confessed, with a wealth of circumstance, the plan which formed in his mind to invade Mrs. James' berth armed with a newly whetted kitchen knife, and the manner in which he carried out his purpose and murdered her.

As to the asserted error in admitting evidence of other misconduct contained in Exhibit L, it is entirely clear from the record that defendant's counsel consented at one time that these matters be read to the jury, though later he objected to them. He had seen the exhibit and informed himself of its contents, and when it was offered in evidence his only objection was that it was a mere memorandum, not that any part of it was irrelevant or immaterial. When he told the district attorney to "read it all", he did not waive the only objection that he had made; he did, however, waive the objection now asserted on his behalf. This, it may be suggested, is technical, and courts should not concern themselves with nice procedural questions where

a man's life is at stake. I agree that ordinarily this is so; but this is a technical appeal in which it has not even been suggested to us that there is any doubt concerning the defendant's guilt. For that reason, and having in mind the atrocious character of the crime, and the conclusiveness of the proof, and the fact that the defendant has made no complaint here concerning the alleged error, I see no occasion for our noticing it.

It was the defendant's privilege to rely upon the presumption of innocence and upon the rule that no inference unfavorable to him should be drawn from his failure to take the witness stand; but when he chose to do so and to let the testimony for the state go unchallenged, I am not prepared to say that we should reverse the judgment unless we are able to see that, in view of the entire record, some erroneous ruling on the trial may have influenced the verdict. To my mind it is so clear that the errors complained of could have had no such effect, that the orderly and effective administration of criminal justice requires affirmance of the judgment.

ROSSMAN, J. (dissenting.)

Like all others, I deeply deplore the crime which took the life of Martha Virginia James. If it were possible to bring back to life that beautiful young woman, who was in the bloom of youth when death overtook her, by disregarding the errors which were committed during the trial at the expense of this defendant, I would do so; but the restoration of her life is beyond our powers. We can do nothing but answer truthfully the question: Was the defendant found guilty and sentenced to the forfeiture of his life in a trial conducted free from prejudicial error.

Every member of this court is satisfied that errors were committed in the trial court. The sole issue before us is whether or not the defendant was prejudiced by them.

The jury was compelled to resolve two issues: (1) Was the defendant guilty or innocent; and (2) if guilty, should his penalty be life imprisonment or execution. As to the second issue, see Constitution of Oregon, Art. I, § 37, and O. C. L. A., § 23-411. Error, prejudicial to the defendant, upon either of those issues must be deemed reversible.

The majority disregard the second of the above-stated issues, notwithstanding the fact that they quote from *People v. Stover*, 317 Ill. 191, 148 N. E. 67, the following:

"A defendant who is fully proved guilty by his own confession, which he does not deny or attempt to invalidate, has no right to complain of error in the trial *where the verdict of guilty has nothing to do with the fixing of the penalty.*"

In my opinion, the erroneous rulings at the trial clearly prejudiced the defendant in the jury's consideration of the issue as to whether he should be imprisoned for life or executed. Before giving my reasons I pause to observe that, although the majority say that the evidence so clearly establishes the defendant's guilt that they are justified in holding the errors nonprejudicial, nevertheless, in their efforts to establish his guilt they lean heavily upon Exhibits K and L, which they hold were inadmissible. Seemingly, they cannot prove the defendant's guilt without resorting to inadmissible evidence. Exhibits K and L are, respectively, the purported Los Angeles and Albany written confessions. Neither bears the defendant's sig-

nature; neither was shown to him; and, as the majority concede, neither was admissible in evidence.

The section of our Constitution above mentioned says:

> "The penalty for murder in the first degree shall be death, except when the trial jury shall in its verdict recommend life imprisonment. * * *"

Section 23-411, O. C. L. A., is to like effect. In *Winston v. United States,* 172 U. S. 303, 19 S. Ct. 212, 43 L. Ed. 456, the court, in interpreting a statute similar to our constitutional provision, said:

> "The authority of the jury to decide that the accused shall not be punished capitally is not limited to cases in which the court, or the jury, is of opinion that there are palliating or mitigating circumstances. But it extends to every case in which, upon a view of the whole evidence, the jury is of opinion that it would not be just or wise to impose capital punishment. How far considerations of age, sex, ignorance, illness or intoxication, or human passion or weakness, of sympathy or clemency, or the irrevocableness of an executed sentence of death, or an apprehension that explanatory facts may exist which have not been brought to light, or any other consideration whatever, should be allowed weight in deciding the question whether the accused should or should not be capitally punished, is committed by the act of Congress to the sound discretion of the jury, and of the jury alone."

Many other jurisdictions have laws similar to ours and to the one construed in the Winston decision. All courts agree that the determination of the penalty is one for the jury's, not the judge's, discretion. *State v. Kelley,* 118 Or. 397, 247 P. 146. They also unanimously hold that a judgment, which imposes a penalty greater than the minimum, must be reversed if the trial judge

received evidence that the defendant committed crimes in addition to the one charged in the indictment.

The defendant, at the time of the trial, was twenty years of age. If he was ever previously convicted of a crime, that fact was not developed at the trial. If he is the person who took Mrs. James life, his motive remains a matter of speculation.

Now let us determine whether the errors, which the majority concede were committed, prejudiced the defendant in the jury's exercise of its discretion as to the penalty. Exhibit L was received in evidence over objections made by the defendant which the majority admit should have been sustained. One of its pages accuses the defendant of rape and threat to kill; other pages attribute to him such crimes as assault, battery and drunkenness. The state's purpose in reading those parts to the jury was to set the jury against the defendant and thus secure (1) his conviction, and (2) a verdict imposing capital punishment. The majority say that those pages were read to the jury upon the invitation of the defendant. Let us see what the record says about that.

As the majority admit, the defendant made valid objections to the admission in evidence of Exhibit L. He fortified his objections with argument which displayed their merit. Not until the objections had been overruled (erroneously, as the majority concede) do we come to the part of the record which the majority say was "the invitation." According to the transcript, the trial judge retired from the courtroom after he had overruled the above-mentioned objections, but before retiring told the district attorney that he could read the exhibit to the jury. During the judge's absence

and while the reading was in progress, the following, according to the record, occurred:

"Mr. Weinrick and Mr. Lomax conferred together.

Mr. Lomax: You started reading it; you might just as well read all of it."

The majority construe those words of Mr. Lomax as an invitation to the district attorney to read to the jury the pages of Exhibit L which recount the questioning of the defendant about crimes and misdeeds which were wholly unconnected with the death of Mrs. James; but when Mr. Lomax spoke the above words the reading had not reached the part of Exhibit L which recounts the questioning about the extraneous crimes. The district attorney came to it later. But, suppose he had already reached that part, had not the court already overruled the defendant's objections? Could not the district attorney have proceeded with his reading whether Mr. Lomax consented to it or not? What could defendant's counsel do at the above juncture except to say, "You might as well read all of it."? All of it was an exhibit. Mr. Lomax had exhausted all available objections. To interpret his helpless reply as an invitation to the state to read inadmissible evidence will cause every attorney who is placed in a like predicament to pray for a sudden stroke of muteness.

After the court reporter's interpolation recited the above incident she next noted that the district attorney continued the reading. When he reached page 32 of Exhibit L he came to the part which recites the questioning to which Lieutenant Howard and Dr. Beeman subjected the defendant about a girl in Los Angeles whom he took to a dance. Of course that incident had nothing to do with the death of Mrs. James. At that

point the defendant's counsel stated: "I object to that statement." The trial judge, who, in the meantime, had returned to the courtroom, ruled: "I can't shut it out; it is part of that statement." Defendant's counsel replied:

"For the purpose of the record, any of those statements showing any other actions that he has been in, that the district attorney speaks of, such as a fight with his wife, that is highly improper, and I think the jury should be instructed to disregard it as throwing no light on this case whatsoever."

The objection was overruled. The noon recess then occurred and at its conclusion defendant's counsel again objected. This time he said:

"At this time, if it please the Court, the defense will ask the Court to strike from that statement any of those references concerning the altercations with his wife or any mention of any other kind of offense. It is a lengthy statement, and I do not have all in my mind, but I think they should be inked out and the jury instructed to disregard them."

Seemingly, at that point the district attorney changed his views, for he said:

"No objection to that motion, your Honor."

Thereupon the presiding judge, in the following words, expressed a purpose to strike from Exhibit L the objectionable parts:

"I am going to eliminate those so far as I can from this statement, either delete them or cut them out."

However, the only part that was deleted consisted of four lines from page 34. The defendant was not responsible for the situation; he had objected to the

entire document and also to the very parts now under scrutiny. After the deletion was made the remaining parts of the page were fastened together in such a way that the mending acted as a bookmark and called attention to that page of the exhibit. At that place there begin several pages of matter which clearly should never have been placed before the jury. The entire exhibit, as the majority agree, was inadmissible, but those pages were peculiarly damaging. Thus we see that nothing was done with Exhibit L at the defendant's invitation. It was all done over his repeated valid objections.

Before quoting from Exhibit L I shall take note of a few of the hundreds of decisions which hold that evidence is inadmissible which shows that the accused committed a crime not connected with the charge stated in the indictment, or that he is a criminal generally. The following, taken from *Boyd v. United States,* 142 U. S. 450, 12 S. Ct. 292, 35 L. Ed. 1077, is illustrative of the others:

> "Proof of them only tended to prejudice the defendants with the jurors, to draw their minds away from the real issue and to produce the impression that they were wretches whose lives were of no value to the community, and who were not entitled to the full benefit of the rules prescribed by law for the trial of human beings charged with crime involving the punishment of death. Upon a careful scrutiny of the record we are constrained to hold that, in at least the particulars to which we have adverted, those rules were not observed at the trial below. However depraved in character, and however full of crime their past lives may have been, the defendants were entitled to be tried upon competent evidence, and only for the offense charged."

This court has spoken to the same effect time after time. A few of the instances are: *State v. Gillis,* 154 Or. 232, 59 P. (2d) 679; *State v. Willson,* 113 Or. 450, 230 P. 810, 233 P. 259; *State v. Brown,* 113 Or. 149, 231 P. 926; *State v. Casey,* 108 Or. 386, 213 P. 771, 217 P. 632; and *State v. Bateham,* 94 Or. 524, 186 P. 5.

The reason for the rule which excludes evidence of extraneous crimes is well stated in *State v. Saunders,* 14 Or. 300, 12 P. 441, as follows:

> "Place a person on trial upon a criminal charge, and allow the prosecution to show by him that he has before been implicated in similar affairs—no matter what explanation of them he attempts to make—it will be more damaging evidence against him and conduce more to his conviction than direct testimony of his guilt in the particular case. Every lawyer who has had any particular experience in criminal trials knows this; knows that juries are inclined to act from impulse, and to convict parties accused upon general principles. An ordinary juror is not liable to care about such a party's guilt or innocence in the particular case, if they think him a scape-grace or vagabond. This is human nature. The judge might demurely and dignifiedly tell them that they must disregard the evidence, except so far as it tended to impeach the testimony of the party; but what good would that do?"

See to like effect Wigmore on Evidence, 3d ed., § 194.

All of the authorities condemn the reception in evidence of parts of a confession which speak of crimes not connected with the one mentioned in the indictment. For instance, Wharton's Criminal Evidence, 11th ed., § 598, says:

> "A confession made by an accused of an offense different from that with which he is charged, and

in no way connected with it, is not admissible on his trial for the offense charged.''

A recent recognition by this court of the rule which excludes from admissibility parts of a confession which speak of a collateral crime is *State v. Sprague,* 171 Or. 372, 136 P. (2d) 685.

I now turn to page 34 of Exhibit L and quote from the exact place where the pasting together of the page summons the eye:

"Q. Going back to this car murder, have you ever killed anyone else on a car?

"A. Killed anybody on a car?

"Q. Yes.

"A. No, no.

"Q. Did you ever get in a berth with a woman on a train?

"A. No, I never seen the inside.

"Q. I am going to ask you if in July of this year —you were making that run around in July, weren't you?

"A. Yes, I was on that run in 1942.

"Q. Last year?

"A. Yes, sir.

"Q. I want to ask you whether or not, Bob, if one night you didn't get into a woman's berth and lay on top of her and put a knife at her throat and tell her you would cut her throat if she didn't lay still, if she screamed, and if you then didn't have sexual intercourse with her?

"A. I never did that.''

Would not questioning of that kind, if conducted in the presence of the jury, call for a mistrial? Yet Exhibit L, from which I have just quoted, was not only read to the jury, but it was sent with the jury

to the juryroom. There was no justification whatever for placing before a jury accusatory questions of that kind.

Surely the above part of Exhibit L prejudiced the defendant, at least upon the issue concerning the penalty. It is true that the above excerpt is in the form of accusatory questions and did not constitute proof that the defendant, in 1942, entered a berth and, under the threat of a knife held against the throat of his victim, raped her, but undoubtedly the jurors, under the circumstances, accepted the accusation as proof. Would they not reason that the police would not have asked those questions, that the district attorney would not have read those pages to the jury, and the trial judge would not have refrained from deleting them from the exhibit if the accusations were unfounded? Naturally, after the presiding judge had told the jurors that he would remove from the exhibit all improper parts, they understood that they should consider the parts he submitted to them. See *Bates v. Preble*, 151 U. S. 149, 14 S. Ct. 277, 38 L. Ed. 106.

Every court which has spoken upon the subject has held that the rule which excludes evidence that the defendant committed another crime, unconnected with the one mentioned in the indictment, likewise excludes evidence accusing the defendant of another crime or showing his intention or willingness to commit one. In *People v. Argentos*, 156 Cal. 720, 106 P. 65, the court said:

"The principle contended for by the appellant, would however, apply even to proof of an accusation of crime as well as proof of its actual commission, because the injury to an accused lies in the fact that proof of either actual commission, or accusation

of another crime, is calculated to prejudice the defendants in the minds of the jury.''

In *Fabacher v. United States*, 20 Fed. (2d) 736, the Circuit Court of Appeals said:

"Another rule is that evidence that the accused had been charged with the commission of another crime is not admissible against him. Coyne v. United States (C. C. A.) 246 F. 120.''

In 22 C. J. S., Criminal Law, § 682, it is said:

"The rule extends to proof of an accusation of another crime, as well as to evidence of its actual commission, to proof of a threat or intention, or of willingness, to commit another crime, and to a confession or admission by accused of the commission of another crime.''

The majority indicate that the part relating to the extraneous crimes was rendered harmless by the fact that when the trial judge ordered the deletion, he said:

"I want to say to this jury that those references in that statement concerning any other offense, no matter what it was, major or minor, have no place in this case, and should not be considered by you or any one of you in making up your minds as to what verdict should be rendered. I am going to eliminate those so far as I can from this statement, either delete them or cut them out.''

But after the deletion was made and the exhibit was handed to the jury, did not the jurors have the right to believe that what was left was proper for their consideration, especially in view of the fact that the trial judge permitted the district attorney to read it to them? The truth of the matter is that jurors can not lawfully disregard a document admitted in evidence. In *Boyd v. United States*, supra, the court, in passing upon a similar matter, held that an instruction similar

to the one just quoted did not suffice. In *State v. Saunders*, supra, this court, speaking of evidence similar to that now under scrutiny, said:

> "The judge might demurely and dignifiedly tell them that they must disregard the evidence * * *; but what good would that do?"

Common observation tells anyone that the above instruction did not suffice. In view of the fact that the material was handed to the jury and was read to them, with the approval of the presiding judge, every juror must have inferred that the instruction above quoted related only to the part actually deleted.

I again quote from Exhibit L:

> "Q. Did you ever threaten her?
> "A. What do you mean?
> "Q. In other words, did you ever have a knife against her throat?
> "A. No. One time I knocked her out. She stabbed me with an ice pick, and I knocked her out."

Quoting further from the questioning, we have:

> "Q. You didn't hurt her?
> "A. No.
> "Q. Did you have a desire to kill her?
> "A. I didn't have none too much to drink that night.
> "Q. Whenever you have too much to drink you have a desire to kill, is that right?
> "A. I guess so because my wife told me a month ago, first and last she expected me to kill somebody.
> "Q. Why did she tell you that?
> "A. I didn't try to find out; but I said, 'Maybe it will be you.' "

The above are only samples of the questioning to which he was subjected about a girl whom he termed a "mere schoolgirl", about a fight he had with Jessie Wilson and about his attitude toward others. The

questioning prompted him to say something about "a lot of killings" in Los Angeles, and, in response to the officers' questions, he told about some fallen victims he saw in alleys. He was asked about other matters that likewise had no relationship to the present charge against him. Very little of that matter pertained to actual misdeeds of the defendant and some of it consisted of what he, under the spur of his questioners' promptings, thought he would do if intoxicated. Some of it, as is evident from the parts above quoted, consisted of accusatory questions. The first impression one receives from reading this extensive material is that the defendant was a killer and that he had a bad criminal record. Upon careful examination, however, it is seen that the impression is erroneous. But even after the truth is perceived, the accusatory questions and their damning effect remain. The damaging effect of false aspersions against a man under indictment is never fully erased. The mind can readily picture the effective use which the prosecutor's tongue made of these erroneously admitted pages. The defendant was undoubtedly branded as a felon whose life was worthless.

Particularly is evidence showing that the defendant committed other crimes deemed prejudicial where the jury fixed the penalty and may have been influenced by the inadmissible evidence.

In *People v. Lane,* 300 Ill. 422, 133 N. E. 267, the defendant had been convicted of murder, and in his trial the prosecution was permitted to introduce evidence showing that he had committed other crimes. I now quote from the opinion:

"It is argued that the evidence amply sustained the verdict, and that there is no question of the

defendant's guilt, but this argument is of no weight in this case, in which the jury have not only the determination of the guilt or innocence of the defendant, but also a wide discretion in fixing the punishment to be inflicted. The defendant had a right not only that his guilt or innocence should be determined without the introduction of irrelevant evidence of other crimes which it could be shown he had committed, but also to have his punishment, if he were found guilty, fixed with reference only to the circumstances of the crime of which he was convicted, and not upon the consideration, also, of other serious and inexcusable crimes which he had confessed. As was stated in the case of Farris v. People, supra, it is impossible for us to know what the jury would have done, and much less our province to say what they should have done, in the absence of this incompetent evidence. Its necessary effect was to close the minds of the jury to any consideration of mercy or leniency, it introduced an element into the case which ought not to have been permitted, and it was prejudicial to the plaintiff in error.''

In *People v. Heffernan,* 312 Ill. 66, 143 N. E. 411, the defendants had been convicted of murder. In reversing their conviction and in refusing to hold that inadmissible testimony was nonprejudicial, the court said:

''The jury in every instance, not only passes upon the question of the guilt of a defendant charged with murder, but are the sole judges of the turpitude of the crime and the proper punishment therefor within the above limits. The defendant is therefore entitled to all material evidence that may tend to mitigate the crime and lessen his punishment. It is also his legal right to have the court exclude all evidence that has no material bearing in his case and which may have the effect of causing the jury to make his punishment greater than they otherwise would if the evidence were limited to the legal and competent evidence in the case. The defendants

in this case were practically tried, not only for the crime of murder as charged in the indictment, but also for the other five robberies admitted in evidence, proof of which was not competent under any legal theory of the case. It is therefore not possible for this court to say that they were not greatly prejudiced by the admission of the evidence aforesaid. We have positively held that a verdict finding a defendant guilty of murder and fixing his punishment at death cannot be sustained, even though there is competent evidence in the record to support it, where incompetent evidence has been admitted which shows the commission of other crimes by the defendant and that have a tendency to influence the jury in fixing the degree of punishment.''

In *People v. Meisner,* 311 Ill. 40, 142 N. E. 482, the defendants had been convicted of murder. The prosecution made the same claim that the majority in the present case have sustained; that is, that the evidence conclusively established the appellants' guilt. In rejecting that claim, the court said:

''Even if it could be said that so far as Meisner is concerned the evidence that he was guilty of murder was so complete that without regard to the incompetent evidence there could have been no other verdict than guilty, it cannot be said that the evidence was not prejudicial to him. The jury had the right to fix the penalty, and they did fix it at the extreme limit authorized by law. Nobody can know what the jury would have done if they had fixed the penalty on the evidence of this crime alone. It is not for us to say what they ought to have done. The defendant had the right to have his case tried on competent evidence applicable to the crime for which he was tried and to have the penalty fixed with reference to that crime, alone, without having all his evil deeds submitted to the

consideration of the jury in fixing the penalty for this one crime."

From *Hurst v. State,* 86 Tex. Cr. 375, 217 S. W. 156, I quote:

"The jury gave appellant eight years for murder. The proposition here may be again stated, that where evidence of an illegal character may have entered into the verdict it will be error if it led to a conviction, when without the error the conviction may not have been obtained, or, conceding the guilt of the accused, that it led to a higher punishment than may have been given but for the error. This character of testimony was not admissible, and the jury did decide against him on his self-defense proposition, and not only failed to give him manslaughter but give him three years in excess for murder."

From *Long v. State,* 98 Tex. Cr. 85, 263 S. W. 1058, I quote:

"Under these conditions, the receipt of the improper testimony upon an important phase of the case cannot be regarded as harmless error, in view of the verdict assessing the extreme punishment for the offense."

The following taken from *United States v. Dressler,* 112 Fed. (2d) 972, it will be observed, presents many parallels to the facts before us:

"The defendant, both in his confession and in his testimony before the jury, described several offenses committed by him during the course of his flight from prison and up to the time of the death of Hamilton. But the fact that there is before a jury legitimate evidence of the commission of offenses by the defendant other than the one for which he is on trial, ordinarily, would increase the chance of prejudice to the cause of the defendant from permitting illegitimate evidence of still other

crimes to go to the jury. Furthermore, reviewing courts frequently have emphasized the duty of trial courts to exercise special caution to keep from the minds of jurors extraneous influences during the trial of a defendant who is charged with a crime which is particularly shocking. It was such situations that drew from the Supreme Court the warning in Boyd v. United States, supra, that proof of other offenses only tended to prejudice a defendant with the jurors, 'to draw their minds away from the real issue, and to produce the impression that they were wretches whose lives were of no value to the community'; * * * The further statement of the Supreme Court in the Boyd case is especially applicable to the situation in the present case: 'However depraved in character, and however full of crime their past lives may have been, the defendants were entitled to be tried upon competent evidence, and only for the offense charged.'

"On the basis of the record before us, it is impossible to say that the jury was not substantially influenced by the information which was improperly before it in arriving at its conclusion to recommend the death penalty."

Many other authorities to like effect could readily be cited. I shall quote from only one more. In *People v. Paisley*, 288 Ill. 310, 123 N. E. 573, the court spoke as follows:

"It is repeatedly urged in the brief and argument of the state that the defendants' guilt is so clearly established that they are not entitled to a new trial, even if it be conceded that all the errors assigned are well founded. This assertion must come from a misconception of the law of this case, wherein the jury are judges, not only of the question of guilt or innocence, but of the amount and character of punishment that should be imposed. The defendants in this case have been given the greatest penalty in the way of imprisonment that is fixed

by the statute, when it was entirely a discretionary matter with the jury as to whether or not imprisonment should be imposed as part of the penalty. No fair-minded man can say, it seems to us, that the errors in this record are not such as to demand a reversal of the judgment.''

A few recent decisions are *Solsona v. State,* 140 Tex. Cr. 305, 144 S. W. (2d) 270; *People v. Moskowitz,* 38 N.Y.S. (2d) 189; *Wright v. State,* 141 Tex. Cr. 265, 148 S. W. (2d) 197; *People v. Mangano,* 375 Ill. 72, 30 N. E. (2d) 428. No decisions taking the contrary position have been found. I believe that all of the above decisions were correctly decided.

By reverting to the provision of our Constitution previously quoted, it is seen that the penalty for first degree murder is not necessarily death. The penalty is determined by the jury and may be life imprisonment or capital punishment. By reverting to the foregoing authorities, it is seen that the trial judge must not permit the state to influence the jury in favor of capital punishment through receipt in evidence of other criminal charges against the defendant, or evidence tending to show that the defendant is possibly a miscreant whose life is not worth much. The above authorities, as well as common experience, render it clear that the parts of Exhibit L which recited the questioning about other crimes prejudiced the defendant upon the issue concerning his penalty. Since evidence of that kind in all of the foregoing cases called for a reversal, it no less requires one in this case. And since in future cases this court will not tolerate evidence of that kind, we ought not to condone it in this case. Although first degree murder in most instances is an atrocious crime, capital punishment

is not the universal penalty. No one can say that the jury would have imposed the death penalty if Exhibit L, with its accusations of extraneous crimes, had not been sent to the juryroom.

Not only am I satisfied that the defendant was prejudiced by the manner in which the issue of life imprisonment or execution was submitted to the jury, but I am also convinced that the rulings during the trial prejudiced him upon the issue of whether he was guilty or innocent.

The facts showing the defendant's guilt, apart from the purported confessions, consist of evidence indicating nothing more than (1) the defendant was aware of Mrs. James' presence in the train; (2) the defendant was in car D shortly before the homicide occurred; (3) the murderer, after inflicting the mortal wound, fled in the direction of the diner; and (4) when the defendant was seen in the kitchen of the diner a few moments after the homicide he was perspiring. Those facts, of course, could not warrant the defendant's conviction. Thus, the state was compelled to lean heavily upon the purported confessions. It is clear that the defendant was properly in car D at the time he was seen there, for all of the dining car crew were instructed to use the lavatory in car D. He was properly in the kitchen when he was encountered there shortly after the murder because, as second cook, it was his duty to be in the kitchen at that hour.

Exhibits K and L were nothing but the memoranda of the two stenographers who wrote them: *State v. Brake,* 99 Or. 310, 195 P. 583; *State v. McPherson,* 70 Or. 371, 141 P. 1018; and Wigmore on Evidence, 3d ed., § 1669.

Exhibit L bore this heading:

> "This is a statement of Robert Folkes taken in the Circuit Courtroom, Dept. No. 2, Linn County Court House, Albany, Oregon, at 7:10 P. M., in the presence of Dr. Joseph Beeman, District Attorney H. L. Weinrick, Lieut. R. G. Howard of the State Police, and Kathleen K. Miller, Court Reporter."

Exhibit K also bore a heading which gave it a false official cast. The headings were not removed when the papers were sent to the jury. These two exhibits were deemed at the trial the defendant's written confessions. The instructions repeatedly referred to both documents as "statements made by the defendant." All members of this court concede that the two papers should not have been received in evidence. The majority's efforts to show that the defendant waived his objections to the exhibits by cross-examining as to them are unavailing: *Wallace v. American Life Ins. Co.*, 111 Or. 510, 225 P. 192, 227 P. 465.

The intimations of the majority that the substance of Exhibits K and L was proper evidence and that it was duplicated by testimony actually given by the witnesses, in my opinion, can not be substantiated. The majority after making those statements conclude that the defendant's objections pertained, not to the facts which Exhibits K and L placed before the jury, but only to the manner in which the evidence got before that body. In the first place, the recitals of Exhibit L, which set forth the questioning to which the defendant was subjected about extraneous crimes, were, in all events, inadmissible evidence. Then, too, Exhibit L contains several pages of material which no witness mentioned and which the majority leave unmentioned. Thus, it is seen that the only information which the

jury received about the material set forth upon those pages came from the inadmissible exhibits, not from any witness.

Based upon § 2-1001, subd. 4, O.C.L.A., defendant's counsel requested the trial judge to instruct the jury that the defendant's oral admissions should be viewed by the jurors with caution. The instruction was not given; nor was any equivalent of it given. The request was proper in view of the following facts: (1) The state, in its efforts to prove the defendant's guilt, was compelled to rely almost entirely upon the purported confessions which, of course, are admissions within the purview of subd. 4 of § 2-1001; (2) the witnesses gave varying accounts of what the defendant said; either (a) he failed to express what was in his mind or (b) they failed to understand him or (c) they failed to repeat correctly, as witnesses, what he said; and (3) there is reason to believe that the defendant was intoxicated when he made the first of the alleged confessions. In sustaining the refusal to give the requested instruction, the majority explain that the error was harmless because "stenographers took down in shorthand a verbatim report of questions and answers in the case at bar. * * * The accuracy of their work is in no way challenged. Their credibility is in no way impeached." And, referring to the testimony of the police officers, which in some particulars does not harmonize with the transcribed stenographic notes, the majority say: "The memory of the officers could not be as detailed as the verbatim report of the stenographers." All of those words refer to Exhibits K and L, which the majority hold were erroneously admitted in evidence. Thus, by the words just quoted the majority deem the erroneously admitted exhibits

highly reliable sources of the truth. The inadmissible exhibits have, indeed, achieved for themselves a superior caste and, in the estimation of the majority, are the Brahmin of the case. Clearly, the error of refusing to give a valid requested instruction can not be rendered harmless through the erroneous receipt of inadmissible evidence. The requested instruction should have been given.

I am satisfied that errors, prejudicial to the defendant, were committed in the three following particulars: (1) The purported written confessions were nothing more than the memoranda of the stenographers and should not have been received in evidence; (2) the purported criminal record of the defendant certainly should have been excluded from the jury's eyes and ears; and (3) the jury should have been charged that the purported oral admissions of the defendant should be viewed with caution.

The result of those errors would be a reversal of the attacked judgment were it not for a proposition to which the majority resort, and which I will now consider. It was not advanced by the state. The majority claim that all of the above errors were harmless and nonprejudicial. No contention of that kind has been made by the state. Since the attorneys for the state, who are the authors of the state's brief, were both present at the trial and familiar with its atmosphere, they are a safer index to the character of the errors, harmless or otherwise, than one who has no knowledge of the case except that acquired from the cold record.

The majority, in their effort to show that the errors were harmless, cite *State v. Foulds,* 127 N. J. L. 336, 23 A. (2d) 895; *State v. Lustberg,* 11 N. J. Misc. 51, 164

A. 703; and *State v. Donato,* 106 N. J. L. 397, 148 A. 776. None of those decisions supports the majority. In the Foulds case the confession bore the defendant's signature, as he himself conceded. He challenged its admissibility on the sole ground that he confessed before his victim died. In the Lustberg case, defendants' counsel expressly conceded the accuracy of the statements contained in the unsigned confession. In the Donato case the transcribed stenographic notes were shown to the defendant as soon as they had been run off on a typewriter. He offered no objection to them, but, according to the decision, did not wish to sign " 'until he sees his counsel' or 'on the advice of counsel.' " It is evident that those cases afford the majority no support. None of them deals with the effect of error. In all of them the court found no error.

After the majority make the above citations they say:

> "Where guilt is conclusively proved by competent evidence, and no other rational conclusion could be reached, conviction should not be set aside because of unsubstantial errors."

That statement is followed with citations to several decisions. One of them was a civil action for money had and received amounting to $591.50. In another the defendant was tried for murder, but was found guilty only of manslaughter. The error of which he complained affected the charge mentioned in the indictment but not the crime of which he was actually found guilty. In another of the cases cited, the accused, who was found guilty of procuring an abortion, could point to no error except a ruling which was later cured by the reception of proper evidence. In another the penalty was only six months imprisonment

in a jail. In another the judgment of conviction was reversed. In still another the error was so slight that the decision does not describe it. In one of the cases the court was much impressed with a feature wholly absent from this case; that is, the presence of reliable, competent eye-witness evidence. In the present case the three eye witnesses who saw the murderer leave the scene of the crime could not identify the defendant as that person. Nothing is gained by comparing the slip-ups in minor cases with the irregularities in a case where the life of a human being is at stake.

In my opinion, none of those decisions shows that the above errors were harmless or indicates that procedure of the kind which was pursued in this case ought to be deemed nonprejudicial. It was Bacon who said, "Set it down to thyself, as well to create good precedents, as to follow them." It is my opinion that the majority are not following the precedents, and I fear the effect of the one which they are creating.

I believe that the errors aforementioned did not fail to exert an influence adverse to the defendant upon the issue of his guilt or innocence. To believe otherwise would be to go contrary to the uniform course of human nature. The statement made by the majority in various forms that the effect produced by Exhibits K and L was no different than if their substance had been given orally by witnesses ignores a phenomenon perceived generally by attorneys—the power of print. More than two and one-half centuries ago John Ray, in compiling English proverbs, found this one: "If it is in print it must be true." A century prior to that a French satirist wrote: "The thing is written. It is true." Exhibits K and L were typewritten. Both bore imposing headings which gave them an official appear-

ance; both went to the juryroom. The very fact that the purported confessions were placed in that form possibly made the mind of some juror conclude "it must be true." To say that the documents were not more effective than the spoken word is to ignore the fact that what is written goes to the juryroom where it can be read and reread. I repeat, that in my opinion, the errors were prejudicial.

The majority say that the evidence against the defendant is so strong that no conclusion can be drawn from it except that the defendant is guilty. In determining whether the defendant is clearly guilty, a member of this court must surely ignore the inadmissible evidence; that is, Exhibits K and L. Then, too, he must not take into account the fact that the jury found in favor of the state; for we do not know what the jury would have done if the inadmissible evidence had been excluded. Finally, a judge of this court—as distinguished from a juror in the circuit court—in passing upon the guilt of the defendant can not take into consideration contradicted evidence nor testimony which was given by a witness whose veracity is challenged by substantial evidence. The reason for that is that if a judge took into consideration evidence which is not manifestly correct and truthful, he would be engaged in the jury function of weighing evidence, passing upon facts and determining credibility. Our Constitution says:

"In all criminal cases whatever, the jury shall have the right to determine the law and the facts, under the direction of the court as to the law * * *."

Art. I, Sec. 16. Of course, where error has been committed no court ought to refrain from ordering a reversal, carrying with it a right to retrial before a

jury, unless the evidence produced by the state is so strong that it possesses an unusually high degree of cogency.

As already indicated, the only evidence of the defendant's guilt consists of the purported confessions. The only persons present when the defendant is said to have confessed were Miss Lyman, Captain Rasmussen and Lieutenant Tetrick, as to the Los Angeles confessions, and Miss Miller, the district attorney, Lieutenant Howard and Dr. Beeman as to the Albany confession. I believe that the majority agree that Miss Lyman and Miss Miller made no effort to indicate what the defendant said in their presence. Hence, one can gain no inkling as to the purported confessions by reading their testimony. The district attorney did not become a witness. Dr. Beeman disclosed very little of what the defendant said in his presence concerning the death of Mrs. James. His brief references to the defendant's statements render it impossible to know whether the defendant admitted the commission of a crime. Those who are left are Captain Rasmussen and Lieutenants Tetrick and Howard. There are circumstances which, in my opinion, call into question the credibility of Captain Rasmussen and Lieutenant Tetrick. The majority concede that the testimony of those men, in one particular at least, was contradicted by witnesses produced by the defendant. I do not believe that any court should base a finding of conclusive guilt upon the testimony of those two witnesses.

I shall now state briefly three or four of the circumstances which place in issue the veracity of the two witnesses just mentioned. Tetrick and Rasmussen swore that, although they purchased for the de-

fendant a bottle of H & H whiskey on their way to Jessie Wilson's house, the defendant had not had a drop of liquor before he made his confession. They were positive that the bottle remained unopened in the pocket of Captain Rasmussen until after the defendant had confessed. According to Captain Rasmussen, the telephone rang while the defendant was in the midst of his confession and before he had made a demonstration of the manner in which he took the life of his victim. It was the defendant's mother who was telephoning and the officers permitted the defendant to speak to her. I now quote from Tetrick's testimony:

> "He talked to his mother on the phone. He said, 'What you read in the papers is true, and I am the murderer.' He said, 'I have just finished telling the officers about killing the girl in berth 13, and all you read in the newspapers is true.' He said, 'I am the man.'"

Shortly the mother came to the home and then, according to Tetrick, the following occurred:

> "He again told her he was a murderer, and he was going back to Oregon to take his medicine."

Referring to what he claimed the defendant told his mother on the telephone, Rasmussen testified:

> "He said to his mother, he said, 'You have been reading in the papers about the killing in Oregon;' he said, 'I done it.' He said, 'I am going back up there and this is probably the last time you will ever see me.'"

The mother, referring to exactly the same incident, testified thus:

> "Q. Now, did you see Mr. Folkes at her room on the 26th day of January, 1943?
> "A. I did.

"Q. And what time of the day was it, Mrs. Folkes?

"A. Well, it was about 8:30.

"Q. About 8:30?

"A. Yes, sir.

"Q. Now, can you tell the jury what his condition was as to being intoxicated?

"A. Well, he was intoxicated.

"Q. Tell the jury how he acted.

"A. Well, he acted like he was highly intoxicated; he acted very funny. He was highly intoxicated, or something was wrong with him.

"Q. Did he at any time call you from this house you referred to as Jess' house?

"A. No, he did not; I called over there.

"Q. Did you talk with him?

"A. Yes, I did.

"Q. Tell the jury whether or not his voice was thick over the phone.

"A. It was.

"Q. Did he at any time tell you he had killed anybody or murdered anybody?

"A. He did not.

"Q. Did you go over to Jess' house to see him?

"A. I did.

"Q. What was his condition when you went in there to see him?

"A. Well, he didn't look natural. He was intoxicated, and his face looked like it were bloated or something wrong with it.

"Q. Did Robert ever make the statement to you, 'This may be the last time I will see you alive.'?

"A. No, he did not."

It appears to me that the above is a direct contradiction of the testimony given by the officers that the defendant, in their presence, told his mother that he was the person who killed Mrs. James.

Bearing in mind that the officers swore that the defendant had not had any liquor whatever before he confessed, and that Captain Rasmussen kept the bottle in his pocket until the defendant had completely confessed, I now turn to Jessie Wilson's testimony. She swore:

"Q. Can you tell the jury in whose company the defendant was at the time you saw him?

"A. Detective Tetrick and Capt. Rasmussen.

"Q. Were you in bed at the time?

"A. Yes, sir.

"Q. Will you tell the jury the condition the defendant was in at the time you saw him?

"A. Well, he was very intoxicated and looked very bad and looked as though he was beaten and his face was swollen.

"Q. Did you see him have any intoxicating liquor in your presence?

"A. Yes, sir.

"Q. Who gave him the intoxicating liquor?

"A. I don't know; he had it himself."

I believe that testimony is fairly susceptible to the interpretation that the defendant was intoxicated when he was brought to Jessie Wilson's home.

It will be recalled that the officers swore that the defendant, after confessing, climbed upon the bed in which Jessie Wilson was lying and using her as a demonstration victim portrayed the manner in which he brought death to Mrs. James. Upon that phase of the case, Miss Wilson testified:

"Q. Were any demonstrations conducted? I refer to any demonstrations upon your body in any manner whatsoever.

"A. No."

How it happened that the trip was made to Jessie Wilson's house also calls into question the veracity

of the officers. They claim that Tuesday afternoon the defendant repeatedly importuned them to take him there, and that they did not yield until just before the trip was made. The state's brief says:

"At various times (T. E. 433, 472) during the latter period of the questioning he indicated to the officers that he would tell the truth and all he knew about the killing if they would take him to his home."

I now quote from page 433, Transcript of Evidence—the witness is Tetrick:

"Q. What was the reason or occasion to take him to his home?
"A. He asked us to take him out there.
"Q. When did he ask you to take him out there?
"A. He asked us several times that afternoon.
"Q. That is Tuesday afternoon?
"A. Yes."

At page 472 Tetrick described the circumstances of one of these requests. He swore that while the defendant was making it he excused from the room three officers who had been there up to that time. Exhibit 2, a transcription of the questioning to which the defendant was subjected Tuesday afternoon, contains not a word which indicates that the defendant requested to be taken to Jessie Wilson's home. It was prepared by Jean Bechtel, a stenographer in the employ of the Los Angeles Police Department and was produced at the trial by the state. The nineteen pages of that exhibit show that, although the defendant was plied with scores of questions from 5:15 p. m. of Tuesday by several officers, he constantly maintained his innocence. In all likelihood, that questioning must have continued until about 7:00 p. m., the hour when the officers swore they took the defendant to Jessie Wilson's house. The

fact that Exhibit 2 contains nothing indicating a request upon the defendant's part to visit Jessie and have some drinks of liquor, in my opinion, can be fairly said to call into question the officers' testimony.

According to the officers, they reached Jessie Wilson's home fifteen minutes after they left the questioning room where the defendant had been maintaining his innocence. On the way there they stopped at a liquor store and purchased a bottle of liquor. A very few minutes after they entered Jessie's room the defendant, according to the officers, made the first of the purported confessions.

I shall not review other of the incidents which place in issue the credibility of the two officers. Our code, in reference to charges which should be given to the jury, says:

"A witness false in one part of his testimony is to be distrusted in others; * * *" § 2-1001, subd. 3, O. C. L. A.

It may be that Captain Rasmussen and Lieutenant Tetrick spoke the truth and that those who contradicted them perjured themselves. It may be that if I had been on the jury and had seen and heard Rasmussen and Tetrick, I would have deemed them truthful men and would have believed them. If I knew that the jurors accepted their testimony as the truth, I, too, could accept it. But I was not and am not a juror. I do not know what the reactions of the jurors were to these two men. It is possible that the jurors disbelieved them. It is my belief that this court ought not to base a finding of conclusive guilt upon their testimony, although, of course, the jury could do so. In so saying, I place no black mark opposite their records—I merely

yield to Art. I, Sec. 16, Oregon Constitution, above quoted. We have no right to weigh the evidence, accept some of it and reject other parts. Evidence which is contradicted must be ignored by this court in a determination of the issue as to whether or not the defendant is conclusively guilty.

Although Lieutenant Howard conceded that there were "some discrepancies" between the testimony which he gave as to the Albany confession and the recitals of Exhibits K and L, we can safely brush the discrepancies aside. But after we have accepted the testimony of Lieutenant Howard as that of a truthful man, I still do not believe that this court ought to base a finding of conclusive guilt upon it alone. It is the evidence of one man only. A jury, I concede, could do so; but we, unlike a jury, do not see the witnesses or know the atmosphere of the trial. As a matter of fact, we have no means of knowing whether or not the jury accepted Lieutenant Howard's testimony. Section 2-1001, subd. 2, O. C. L. A., speaking of the instructions which shall be given to a jury, says:

> "They are not bound to find in conformity with the declarations of any number of witnesses, which do not produce conviction in their minds, against a less number, or against a presumption or other evidence satisfying their minds; * * *"

Art. VII, Sec. 3, Constitution of Oregon, I am sure, does not warrant the course taken by the majority. If the previously mentioned errors were nonprejudicial, the attacked judgment ought to be affirmed; but if they were prejudicial—and I maintain that they were—the attacked judgment certainly ought to be reversed. The affirmance of a judgment fraught with reversible error is an infraction of the Fourteenth Amendment which

prohibits the states from depriving any person "of life, liberty or property without due process of law."

If the defendant is guilty, his guilt should have been established in the way prescribed by law. He ought not to have been handicapped through placing in the scales of justice prejudicial matter which weighed heavily against him and which consisted of (1) several accusations of crime (rape, assault, threat to kill, etc.) of which he was not guilty; and (2) stenographers' memoranda which the defendant never saw, signed or approved, but which were submitted to the jury as his written confessions. He should have had the benefit, uniformly accorded all others accused of crime, of having the jury instructed that his oral admissions should be viewed with caution. If the evidence showing his guilt is as overwhelming as the majority indicate, the state will have no difficulty in proving his guilt. A judgment of death, which is infirm through grave error, ought not to be affirmed. The cause should be remanded to the circuit court for another trial.

For the above reasons, I dissent.

KELLY, J., concurs in this dissent.